**THOMAS et al. v. BUNCH. \***

No. 12470.

Court of Civil Appeals of Texas. Fort Worth.
May 30, 1931.

Rehearing Denied July 3, 1931.

360

Preston Martin and Hood & Shadle, all of Weatherford, for appellants.

Grindstaff, Zellers & Hutcheson, of Weatherford, for appellee.

CONNER, C. J.

This appeal for the second time involves a controversy between the appellee, A. H. Bunch, and Mrs. M. E. Thomas and her son Lewis, a history of which is to be found in our opinion on the former appeal. See Bunch v. Thomas et al., 290 S. W. 569.

Briefly stated, appellee, Bunch, as successor in title of one H. H. Hubbard, is the owner of some 318 acres of land situated in Parker county. Mrs. M. E. Thomas is the surviving wife, and Lewis Thomas is the surviving son, of Dave Thomas, deceased, and as such own a tract of land of which the cultivated part, consisting of some 100 acres or more, lies immediately south of the Bunch land. Between the Bunch land and the cultivated portion of the Thomas land is a public road about 40 feet wide, which extends east and west. The evidence tends to show that the land immediately affected is, for purposes of cultivation, practically level; but on the Bunch land there is a gradual decline from the north, east, and west toward about the center of the cultivated fields.

The evidence shows that about the year 1905 H. H. Hubbard, the then owner of the Bunch land, instituted suit against Dave Thomas, the then owner of the land now owned by Mrs. Thomas and her son, to abate a small dam about 2 feet high and perhaps 100 or more feet long, erected by Thomas just inside of the north boundary line of the Thomas tract. The basis of the Hubbard suit was a claim that the dam interrupted the natural flow of storm waters and backed the same up on his tract to his damage. That suit resulted in a judgment in favor of Thomas, which has never been set aside.

The record discloses no further contests between the respective owners of the tracts of land mentioned until Bunch instituted this action against Mrs. Thomas and her son, alleging that he had purchased his tract in November, 1918, after which the Thomases had begun repairing and building higher and wider and making more substantial the original embankment and dike on the north line of their property, which, it was alleged, ranged from 1 foot to 18 inches in height at its crest and extending in length at the extremities of the embankment. It was further alleged that, during the years 1921, 1922, and 1923, that embankment had been extended a further distance of 100 feet, and made from 2 to 4 feet higher, thus diverting the natural flow of the surface waters and causing the same to impound and cover

with water some 40 acres of plaintiff's land, to his damage in the aggregate of $800, and he prayed that the embankment complained of might be abated and the defendants enjoined from constructing other or further embankments and for a recovery of damages.

The defendants pleaded in bar of the action the maintenance of the dam for some 20 years and also the judgment that had been rendered in the Hubbard suit.

The trial of that proceeding resulted in a judgment in favor of the defendants, from which Bunch duly prosecuted an appeal to this court. On that appeal we ruled, in effect, that the pleas of limitation and res adjudicata, presented by the defendants, was available and effective to the extent only of establishing their right under the common-law rule as it existed prior to May 29, 1915, to maintain the dam as originally constructed, but sustained the plea of plaintiff Bunch in so far as the dam had been enlarged and extended, if at all, after that date, and accordingly reversed and remanded the case for another trial upon those issues.

The decision so rendered was acquiesced in by the parties, whereupon Bunch, on November 8, 1928, filed his second amended original petition, alleging, substantially as before, an enlargement of the Thomas dam and resulting damage.

The defendants, as before, presented a general denial, the statute of ten years' limitation, the Hubbard judgment,• and specially, among other things, that, if it should appear that the defendants had extended the embankment higher and longer since the rendition of the said judgment between Dave Thomas and H. H. Hubbard, they were compelled to do so by reason of the acts of third parties, including the owners of the lands now owned by Bunch and the commissioners' court of Parker County in digging ditches and making levees and maintaining the public road with culverts on and across the same, and digging ditches on the sides of said road, thereby causing the accumulation of vast amounts of water and diverting the same from its natural flow and throwing it on defendant's land.

After the introduction of the evidence, the case was submitted to a jury upon special issues, which, together with the answers thereto, are as follows:

"1. In August, 1915, was there a levee or embankment on the north side of defendants' land and inside their fence on the south side of the public road and near the southeast corner of the plaintiff's land and at the place testified about by the witnesses? Answer: Yes.

"2. If you have answered 'yes' to the preceding question, then answer: Since August, 1915, have the defendants built up or added to the height of the said levee at the place referred to above and as the same existed in August, 1915? Answer: Yes.

"3. If you have answered special issue No. 2 'yes', then answer this special issue: Since August, 1915, how much higher or additional height, if any, have the defendants added to the said levee above inquired about? Answer: Two feet.

"4. Since August, 1915, has the defendants or either of them extended the length of the old levee, if any, eastward? Answer: Yes.

"5. If you have answered special issue No. 4 'yes,' then state in feet how much, feet or inches, or both, said levee has been extended to the east, if any? Answer: 35 feet.

"6. Would water that falls on the plaintiff's land and north and northwest of the place of the levee in question naturally flow to and across the defendant's land, if unobstructed? Answer: Yes.

"7. If you have answered special issue No. 6 'yes' then answer: Does said levee as it now exists obstruct the natural flow of water which would naturally flow to that point and cause such water to flow back and gather on plaintiff's land? Answer: Yes.

"8. Does the surface water accumulate on and overflow more of plaintiff's land? Answer: Yes.

"9. If you have answered special issue No. 8 'yes,' then you will answer this issue: Is the extra accumulation of water and overflow on plaintiff's land, if any, due to the said act and acts, if any, of persons other than the defendants in the digging of ditches and in the construction and the maintaining the road in question? Answer: No."

The court, upon the verdict, and a finding of its own that "the building of the same dam higher and the extension of the same eastward by the defendants impounded more waters on the land of plaintiff and caused damages to the lands of plaintiff," entered a judgment in favor of plaintiff, Bunch, requiring and directing defendants Thomas to obliterate and remove 35 feet of the dam beginning at the east end of the levee, and, in addition thereto, remove from the top portion of the remainder of said levee and embankment 2 feet thereof for the entire length of same after the east 35 feet thereof has been destroyed. The defendants were further permanently enjoined or restrained from building the embankment any higher or making it any longer after the same had been modified as provided in the judgment.

To the judgment so rendered, the defendants excepted and have duly prosecuted the present appeal.

▮ The legal effect of our opinion on the former appeal, reported in the case of Bunch v. Thomas, 290 S. W. 569, already referred to, was that the pleas of limitation and the

binding effect of the judgment between Dave Thomas and H. H. Hubbard could not, in view of the state of the common law prior to May 29, 1915, constitute a bar to the suit of Bunch for damages, if any, caused by the enlargement and extension of the original dam. We therefore overrule appellants' assignments of error to the action of the court upon the last trial in sustaining appellee's exceptions to the renewed presentation of the pleas of limitation and res adjudicata.

■ We feel strongly inclined to sustain appellants', propositions contending that the judgment in appellee's favor is not sustained by·the findings. It is to be noted that the jury found that the levee, embankment, or dam complained of, "as it now exists," obstructs the natural flow of the water and causes it to flow back and gather·on plaintiff's land, but did not find how many more acres are thus caused to be overflowed, how long such water may remain, whether the land is tillable, whether the land is injured rather than benefited, or whether plaintiff is prejudiced or injured in any way. Under our statute, authorizing issuance of injunctions (article 4642, Rev. Statutes, 1925), an applicant therefor must show himself, not only entitled to the relief sought, but that such relief requires the restraint of some act prejudicial to him; or that some irreparable injury to real estate has been done. The rule is substantially the same if an appeal be made to the principles of equity, rather than under the strict terms of the statute. See Story on Equity Jurisprudence vol. 2 (14th Ed.) § 1252, and cases cited in notes. An application for injunction is uniformly subjected to a strict construction. See Collins v. State Bank of Houston (Tex. Civ. App.) 241 S. W. 633. Mere uncertainty or mere apprehension of injury is not sufficient. Southern Oil Corp. v. Waggoner (Tex. Civ. App.) 224 S. W. 230; Browning v. Hinerman (Tex. Civ. App.) 224 S. W. 236. It is true that the· judgment recites a general finding by the court, to the effect that the building of the dam higher and the extension of the same "caused damages to the land of plaintiff." Some such finding, we think, was an essential element to appellee's right of recovery. It was decided in the case of Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084, that the rule established by article 2190, Rev. Statutes, that on appeal in a case submitted on special issues an issue not submitted or requested to be submitted is deemed as found by the trial court in such manner as to support its judgment, applies only to such omitted issues as are supplemental or incidental to, and which support, the findings on which judgment was based; that 'it does not extend to independent grounds of recovery or ·defenses; that these are waived by the party asserting them by failure to request their submission; that they cannot be considered as found by the court

in his favor in order to support a judgment not warranted by the findings on independent grounds of recovery or defense upon the special issues which were submitted. We especially think that the evidence fails to support the answer of the jury to the ninth special issue, hereinbefore quoted.

■ We have carefully read and considered, more than once, the evidence in this case, the pertinent parts of which we attach as an exhibit to this opinion for the benefit of those who may desire to verify or combat our conclusions thereon. [See end of opinion.] As we view the evidence, the agricultural lands affected by the proceedings complained of were originally unimproved and practically level, with a moderate decline from the north, east, and west of Bunch's land to a point about two feet lower, where appellant's dam was constructed; that the evidence fails to show that there was any well-defined branch or causeway for flowing waters from the depression just indicated, and that, undisturbed by ditches or otherwise, falling rains would spread out and be largely absorbed by the ground; that Dave Thomas, as early as the year 1905, constructed the dam or embankment in question for the purpose of interrupting flows of surface water that had been caused by ditches dug by Hubbard causing additional water to accumulate and converge in volume at the point on the Hubbard land immediately north of where the dam was constructed. At that time the road between the lands of the parties was ungraded, and waters impeded by the dam, presumably at least, either remained or found an exit beyond the tillable lands to the east or west. We need not review the common law or decisions which so authorized Thomas to so construct the levee upon his lands for their protection. He undoubtedly at that time acquired a vested right to maintain his dam as originally constructed well within the protection of constitutional guaranties for the rights to property. As noted in the beginning, the original dam was constructed about 2 feet high and some 100 or more feet long, and the judgment in this case requires the dam to be abated at its highest point 2 feet and 35 feet from its eastern end, thus entirely removing and destroying the dam. the right to maintain which was vested in Thomas. Not only so, but by an examination of the evidence it will be seen that at least two witnesses, not shown to be interested, measured with an approved measuring gauge the dam in question the evening before the day of the trial and found its highest point to be but 21½ inches. So that, to comply with the judgment the original dam, as Thomas had the right to maintain it, must not only be removed, but also 2½ inches of the surface below the foundation. It is true there were estimates or opinions given by some of the witnesses in behalf of appellee, to the effect that the original dam had been elevated and

extended as found by the jury, but they were mere estimates of an inconclusive character. So that, on the whole, as indicated, we gravely doubt the sufficiency of the evidence to sustain the verdict and judgment so drastic in effect. We think the right of one person to have the property of another destroyed for his own benefit should be clearly established. We do not feel satisfied that that has been done in this case. This is particularly true, in view of an assignment of error complaining that the answer of the jury to special issue No. 9 is unsupported by the evidence.

■ It will be recalled that, in answer to special issue No. 9, the jury found that the extra accumulation of water and overflow on plaintiff's land was not due to acts of persons other than the defendants in digging ditches and in the construction and maintenance of the public road between the farms. Again referring to the testimony in our notes to the opinion, we think it will plainly appear that this finding should be disapproved.

The plaintiff's witness, Collins, testified that he lived on the Bunch farm from 1912 to 1916; that in 1916 there was no dam on the north side of the Thomas farm that impounded water on the Bunch farm; "only the road bed," which had been built up some higher than the fields on both sides of it; that he had been drowned out a little on some of the land he cultivated, but thought "the rise in the road there had something to do with it and not the natural depression." He further testified that in 1918 a dip had been put in the road about 3 feet lower than its level and ditches about a foot or a foot and a half deep constructed on each side of the road; that there was a natural pond or depression back in the north part of his cultivated land, by reason of which he had lost 8 or 10 acres by water standing in it. That the water would not stand long in this basin "if there was a ditch down on through the Thomas land"; that after the county graded the road about 3 feet higher it would throw the water on the Bunch farm if the dip was not there. The evidence further shows, in substance, that the ditch mentioned by Collins had been later opened or maintained with Bunch's knowledge, and that Bunch himself cut a ditch through the road bed at a point just above the Thomas dam and later, with the consent of the road commissioners of the precinct, the dip was put in, and, yet later, a culvert; that the ditches on the north side of the road were a foot or two deep and necessarily gathered flowing waters from the east and west of the culvert and concentrated them at the point of the dip or culvert. A county commissioner testified that the dip or culvert had been put in with his consent to "put the county in the clear." We have been cited to no decision which will justify a county in the construction and maintenance of a public road to thus care for the county's interest at the expense of an abutting owner.

■ The evidence fails to show that the configuration of the land is such that the county or Bunch might not at a reasonable cost so extend or perhaps deepen the ditches on the north side of the public road as to conduct the accumulating flood waters to a proper passway beyond the Thomas farm. At all events, the appellee Bunch, or others, may not lawfully so alter the embankment of the road and cut through or dynamite the dam of appellants, as the evidence shows was more than once done, in order to relieve appellee's lands from occasional accumulation of surface waters.

■ There is a contention in behalf of appellants that the Act of May 29, 1915, 1st Called Sess., c. 7 (Vernon's Ann. Civ. St. Supp. 1918, art. 5011t) was repealed by the final title of the Revised Statutes of 1925. But we feel unable to agree with this contention. Pending the operative force of the act of May 29, 1915, there was a revision of our irrigation laws in March, 1917. See Acts 1917, c. 88. Section 80 of the 1917 act was carried forward in the revision of 1925 as article 7589. This article reads: "It shall be unlawful for any person, association of persons, corporation, water improvement or irrigation district to take or divert any of the water of the ordinary flow, underflow, or storm flow of any stream, water course, or watershed, in this State into any other natural stream, water course or watershed, to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted."

We conclude that the Legislature in the enactment of the act of 1917, and in the inclusion of section 80 of the act in the revision of 1925, manifests the legislative intent to continue the protection afforded by the act of 1915, and that therefore article 7589 is operative and controls the rights of the parties in this case. See Town of Belvidere v. W. R. Co., 34 N. J. Law, 193; Gorley v. Sewell, 77 Ind. 316, cited with approval in G. & W. Ry. Co. v. City of Galveston, 96 Tex. 525, 74 S. W. 537. We do not think, however, that that article can be held to be operative so as to prohibit the appellants from so maintaining their dam or embankment as to protect their own lands from floods and accumulated waters arising from and caused by acts or constructions by other persons. In other words, we think the appellants were, not only entitled to maintain the dam in question in its original height, breadth, and length, but also had the right to increase those dimensions so far as was reasonably necessary to protect their own lands from accumulated waters caused by acts and constructions of others. See G., H. & S. A. Ry. Co. v. Tait, 63 Tex. 223;

C., R. I. & G. Ry. Co. v. Martin (Tex. Civ. App.) 37 S.W.(2d) 207, and cases therein cited.

Other questions presented could probably be appropriately discussed, but we have already extended our opinion at considerable length with the hope that we might thereby bring about a final settlement of a heated controversy between neighboring owners that has extended over a period of more than 25 years.

Since, in our opinion, the evidence fails to support the verdict and judgment below in essential particulars, the judgment of the trial court will be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

### Notes of the evidence referred to in the opinion, to which this is attached as part thereof.

1. For the plaintiff the witness W. M. Collins testified, among other things "I lived on the Bunch farm four years, from 1912 to 1916. * * * My last year on the place was in 1916. The same part of the farm was in cultivation then as is now. The principal field lay directly north of the Thomas farm, and the same road runs between the two farms then as now. * * * I was acquainted with the natural drainage of the water there on the place. * * * The water would drain south out of this field; the drainage slopes down to the road between the Bunch and the Thomas farms. * * * In 1916 there was no dam on the north side of the Thomas farm that impounded water on the Bunch farm; only the road bed, the road was a little higher or built up. The road was some higher than the fields, than the fields on both sides of it. Sometimes water would run over it and sometimes it wouldn't. There was nothing then except the roadbed with no embankment on the Thomas farm. I tried to cultivate all this field in north of where the embankment is now; I was drowned out a little on some of it. There were eight or ten acres drowned out. I think the rise in the road there had something to do with that and not the natural depression. * * * This embankment was built there in 1917. * * * The dam has been built up longer and higher. * * * In the Spring of 1918 they built the dam up two or three feet higher at the highest place. It was about 250 or 300 yards long. That was the first substantial embankment I had ever seen there. The bank has held more water there that has come off the Bunch farm and caused more impounding of water there. * * * "

On cross-examination he said:

"I couldn't say about when the county graded that road up there; it was in 1918 they put a dip in there. The bottom of the dip was about three feet below the level of the road. * * * That was in 1918. * * * The ditches on either side of the road were about a foot or a foot and a half deep. I made four crops on the Bunch land. I worked the place from 1912 to 1916. There is a natural pond or basin back in the north part of it. * * * I lost eight or ten acres by water standing in there. * * * Water wouldn't stand long in there if there was a ditch on down through the Thomas land. After the county graded the road about three feet higher if you didn't have that dip in there it would throw water on the Bunch farm, yes. * * * There was a ditch on the place when I worked it that came down across the field from the east. * * * That old ditch ran northwest and southeast. * * * About fifty feet north of the road the land is a lit-

tle lower there than anywhere else. Were it not for that dam, levee and road-bed obstruction, the water would not stand in this field so much there; the water might cover an acre. * * *

"When they cut the road bed through there and made that dip about three feet deep that would have a tendency to put the water over on the Thomas land, yes. * * * The purpose of the road ditch I think was to put a dip in there and let the water out from this north side. * * * That cement dip was made necessary because of the increase in the height of the road bed."

J. W. Brock testified, among other things:

"This property in controversy is located in Precinct 3, in the precinct in which I was formerly County Commissioner. * * * I have been down there and inspected the situation there officially. * * * I never saw anyone building the bank (the dam) up there. I first saw it in 1923. * * * The bank would interfere with the natural flow of the water, yes; it would cause water to back up on the Bunch land. Had the embankment not been there in 1923 the water would not have been impounded there as much as it was. * * * The cement dip was in there when I was elected commissioner. It had filled up with sediment till it caused water to stand in there. I had it cleaned out and overhauled and placed a little culvert over it. I did authorize and I didn't authorize a culvert to be placed over the dip, in a way. We talked about it. Mr. Bunch was overseer at the time and he went ahead and put the culvert in there before I knew anything about it. * * * Mrs. Thomas and her son were not satisfied with it, and we took that one out. I graded the road up and had Mr. Roy Young put a culvert in there that would be substantial and carry the water out of the road. * * * I put the culvert in there to protect the county. That was in 1923. That was about the time Mr. Thomas started building the dam higher. * * * It was not built very much higher or very much longer. * * * The higher they built the dam the more water it would impound, yes. That would not cause the water to stand in the road more; it would go on east and they would have to go on east extending the dam, yes. * * *

"The dip is not far from the center of the Bunch land. The dip is nearer one end of the dam than the other. Mr. Bunch, I think, cleaned out that dip; I told him to do so, so the water wouldn't stand in it. * * * I don't think the road-bed would impound water on the lands north of it. The road-bed was made higher down there, yes. The water on the north of the road-bed couldn't flow across the road, but I cut an opening in there so it could get across. Assuming there was no opening in there it would impound water in there. The dip was not put there so the water could escape from the lands on the north of the road and go on; it was put there to get the county in the clear; it was to get the water out of there, yes. All the water would stand there on Mr. Bunch's land, because that dam or levee wouldn't let it go by. The water would first have to get high enough to get over the road and over the embankment with no cut or dip in there before it would go on. * * * I have noticed a depression up here in Mr. Bunch's land, yes. I don't know how much land this depression covers; I didn't measure it and didn't give it much thought; I would say anywhere between in the neighborhood of ten or fifteen acres. * * * During wet spells and rain that depression would fill with water and form a little lake; * * * the water would stand there from 100 to 200 yards along there; that was years ago, yes. * * *

"When the road was graded up after I went in as commissioner that produced an obstruction, an elevation that would obstruct the natural flow of the water, yes. I then put a dip in there for the county. In other words, I did not want the County to be impounding water and backing it up; then it

was up to them about what they did about the dam."

A. S. Cooper testified:

"I remember when the commissioners' court put in a concrete dip there; that was in 1918. The dam was built up higher after this cement dip was put in there. * * * I would say it was built from two to three feet higher after the dip was put in there, and was built longer, it was made twenty-five or thirty feet longer, that is a mere guess of how much it was lengthened, and built two or three feet higher at that time. In that condition it would impound water, yes. In that condition it would obstruct the natural flow of the water, yes. * * * It obstructed more water then than it did by the artificial roadbed before the cement dip was put there. In 1918 immediately after the cement dip was put in there I have seen as much as twenty or twenty-five acres on the Bunch land under water, after the dam was built longer and higher, or thereabout. The levee is what was holding the water back upon the Bunch land. The levee on the Thomas property, yes, is what helped to hold it. In 1923, I remember when the commissioners court put a culvert in there that year. * * * I think that dam has been raised higher from year to year since 1923. * * * That is my judgment. * * * It was raised the same year the culvert was put in there and was made longer. I would say it was raised from a foot to a foot and a half higher and extended in length anyway from twenty to thirty feet longer. * * *

"Of course the road built up and a three foot dip put in there would change things considerably; it has changed conditions and the flow of water there. There has not been a dam on the Thomas side as far back as I can recall. It was there during the latter part of the life time of Mr. Thomas. I think there was a dam there in 1905, before the old gentleman died."

Frank Hubbard testified, among other things:

"* * * I have been knowing the two farms since the year 1899. The slope or drainage on the Bunch farm ever since I have known it has been south towards the creek, and it drains across the Thomas farm the same way, which is down hill; it goes south. The old road was leveed when we went there some and it has been growing worse; this old road has been building up since then. When we went there there was no dam or levee on the north side of the Thomas farm to amount to anything. The road was there and built up at that time; there are ditches on each side of the land. * * * There was a natural lake or basin on the Bunch farm that held water then; it is back northwest from the corner where the water usually crosses it; it covered only a few acres of land. * * * I remember when the commissioners court put a cement dip in there across this road in 1918. Prior to that time the dam on the Thomas north side was a part of the time high and a part of the time not high; it washed down. * * * Immediately after the cement dip was put in there they did some work on this dam making it higher and making it longer at different times since then and before that, too. * * * I don't know if it is as high now as it was in 1918, because I don't know just how high it was then. * * *

"My father (H. H. Hubbard) formerly owned that Bunch tract of land. He bought this land in about 1903. * * * In 1905 my father had a lawsuit with Dave Thomas. * * * That law suit was over that dam there on the Thomas side, yes. At that time that dam was about two and a half feet high above the road; the water stood about thirty inches deep in the road then. The dam was just below the water level, something like three feet in height then, and it reached from away back close to the hill, something like 300 yards west and something like fifty yards east past where it broke through. * * * In repairing it from year to year it was built up pretty high. Dave Thomas died in 1911 and as long as he lived they kept keeping that dam up; they kept it repaired up until 1915 to keep water from

running over it. Four years after he died that dam was three feet high some of the time. They kept it up until 1916 and since then they let it go down somewhat. It washed down and settled down somewhat; it is more than two feet above the level of the fields. * * * There was a swamp on the land when my father owned it, yes. Water would stand in that basin some years and some years it wouldn't. I didn't help cut that ditch; my father cut it, I don't know what year it was; but while he owned the land. The ditch he cut angled down across the field and down to the south side. * * * The purpose of that ditch was to draw water down into the road. * * * The effect of that was that it would throw more water into one location, yes. I don't know anything about the dynamiting of the dam; I heard of it being done. * * * I know of the dam being cut; I cut it once and I know of some other parties cutting it. * * * When I cut it water goes down over the Thomas farm. * * *"

For the defendants, Mrs. Winnie Hitt testified that she had known the Thomas and Bunch farms all of her life, and that: "I know where that dam is just below the Bunch farm, yes. The dam has been there several years. The fence and dam are right together. I saw the dam after it was completed in 1923, yes. I saw something done to the dam about that time, yes. * * * I heard an explosion of some kind. * * * I was at home at the time of the explosion. I went to the river after hearing the explosion, and went within a few feet of this dam in going to the river. I saw two men there. At that time I was within 150 yards of them. They were walking along in Mr. Bunch's field due west from the dam; they both had guns. * * * They were young men; that is all I saw; they were leaving then. I knew Mr. Bunch, yes. I don't think he was one of them. * * * Mr. Bunch had sons and sons-in-law on the place about the size and age of the men I saw there. I saw them and knew them. I think it was Mr. Rockwell and Mr. Bunch's son. Mr. Rockwell is Mr. Bunch's son-in-law. That is my best judgment of who they were 150 yards away. * * * I am not related to any of these people and have no interest in the case whatever."

J. W. Smith testified: "I heard about the dam being dynamited a few years back; I heard the report of it. * * * I saw a little smoke and heard an explosion or something; it appeared to be at the dam. I didn't go down there and see the effect it had on the dam. I saw somebody at the dam a running pretty fast; they were going north, there were two men and they were going north coming from the explosion."

S. S. Gilbert testified: "I have lived in this county all my life. I have been sheriff and have been county commissioner in this county. * * * I was commissioner in 1918, 1919, 1920 and 1921. * * * I know where this land in controversy is and the road running in between the two farms. That is in my commissioners precinct. I have known that land down there since 1905. * * * I noticed the dam on the Thomas place back then in 1905 and have noticed it in passing at various times. * * * The road runs east and west there. When I first went into the commissioners office between the road and the ditch on the north side was a high place. That was on the Bunch land. That high place would hold water there and I have seen a pond or a lake on the north of it. This embankment that was on the Bunch land was cut and that let the water out and turned the water loose onto the Thomas land. * * * While I was commissioner I think it was Mr. Rockwell tried to get me to cut that dam loose and let the water loose. He is son-in-law of Mr. Bunch, yes. I didn't do it."

George Lassater testified: "* * * I was rural mail carrier down in there from 1923 to 1926. I know where the Bunch and Thomas farms are located, yes. They are on my route. I had occasion to pass along those roads and passed along that road running between the two farms. We had rains during that time, yes. I have observed water standing

up there on the Bunch farm along the road, yes. * * * At times the water would be backed up there 150 or 200 yards. I know where there is a depression out in the Bunch farm from the road, yes. I observed it. There was such a lake up there, yes. * * * I have seen ditches or drains cut through the Bunch field down into the road. * * * The ditches would be leading from the north side of the road to the south side from the Bunch land to the Thomas land. The ditch across the road was full of water and I couldn't tell how deep it was, but I judge it was about two feet wide. I don't know who cut the ditches. It was full of water and I couldn't tell how deep it was. It appeared to be a freshly cut ditch and was right across the road. That was either in 1923 or in 1924. * * * The day before I saw this ditch the road was all right. I passed along the road the day before and did not cross that ditch. I knew I couldn't cross it; I knew I would stick my Ford, so I just backed up and went back to the post office and went around another road. Water was going through that ditch. The water was going through this ditch south onto the Thomas land. * * * The cut was repaired after that, yes. * * *

"If the water had been ditched on down farther there and turned south, it would not have gone or would not go across the Thomas land at all, no."

J. L. Carter testified: "* * * I know the Bunch farm which is immediately north of the Thomas farm. I came to that neighborhood in 1895 or 1896 and rented the place just south of the Thomas farm. * * * The lake would cover something like 15 or 20 acres; that was in the nineties when I was working on the Thomas farm, * * * It was practically level land between the two farms, and there was a road between the two farms then; it was a public road, but had never been graded. Before any grading was done on that road there was a number of natural lakes and ponds in there. There was one on this place north of the road and it ran down into the road there. The water spread out over the road and into the field. The water would extend into the field on the east in what they used to call the Cooper place; that is now called the Jordan place; that was before any road grading was done. That was during the lifetime of Uncle Dave Thomas. Later on there were ditches cut on the north side of the road. I don't know who cut the ditches on the north side; I was in Eastland County then. I left Parker County about 1897, but when I came back I saw where the ditches had been cut. It looks to me like the ditches would change the watercourse; they were cut towards the Thomas place, and they threw water to one point and the water would spread out before that. There was a levee thrown up on the inside and there were ditches cut down through that lake bringing it towards one point, bringing it south towards the Thomas land. Someone cut a spillway across the road and a levee was then thrown up in the Thomas land; the levee was thrown up after the spillway was cut, but prior to that there was no levee. That was back either in 1895 or 1896. That ditch I observed through the land north of the Thomas place was something like 100 or 200 yards long. The effect of cutting that ditch was it forced the water down there to the Thomas land. It would come in there at that place in larger quantities; with no ditch the water would spread out."

Clint Riddle testified: "* * * I have lived in that community where those two places are. I lived on Mr. Bunch's place in 1926 and 1927, two years. There was some ditching done in his place those two years. I did it. It was done on that eighty acres block that was in cultivation immediately north of the Thomas farm. * * * I observed water standing on Bunch's land on the south side lying north of the Thomas farm. There was a pretty good sized lake in there. Lots of water stayed in it; water stood there all the time, yes."

Bob Pearson testified that he lived in the neighborhood in 1923 and 1924, and knew the farms in question; that: "I heard the dynamiting report, I heard just a kind of booming noise like a blast, like an explosion. * * * I didn't go and make any investigation of it at that time. I did later on. We went up there and got some fuses where that blast was, in Mrs. Thomas' place where the dam was. We found the dam blown up when we got there, and the water was going over onto Mrs. Thomas' field. I found that there, yes. That is a dynamite fuse. * * * I reckon that dam (the dam on the Thomas land) has been there ever since I knew the Thomas place; I don't remember how long. That would be about nineteen years. I have passed along there and have observed it. I have been there recently and made an investigation of the height of that dam. I was there Sunday. Louis Thomas was with me. That dam is 21½ inches high at the highest place. I used a measuring stick you measure oil and gas with; it had inches on it. The highest place we measured was 21½ inches. We measured it on the north side of the dam; the side next to the road; the side that holds the water. We measured it at different places along there; the highest place we could find was 21½ inches."

Lewis Thomas testified: "I am the son of Mrs. Thomas, defendant in this case, and am son of Dave Thomas. My father is dead; he died in 1911. * * * There are 118 or 119 acres of land in cultivation in our farm south of the Bunch farm. * * * I am fifty-two years old now. I have lived down there all my life. I live down there now. I was about 27 years old when my father had a law-suit with Hubbard on that land. * * * That was over the dam on my father's land along there then. That same dam is at the same place as it was then; there has been a dam there all the time since then. I think that dam was first built in there in 1903 or 1904. Hubbard used an engine in there and a pump to pump the water out. He used the engine to pump the water out of what is the Bunch land now; he pumped the water out into the road; that is the starting of the dam. The road was higher than our land was then; the road has been graded up all along there now; it was graded up away back yonder; they just took turning plows and plowed it and threw it up in the center, and left drains on either side of the road. I know when that concrete dip was put in there. It was put in in 1917 or 1918, somewhere along there. Since 1915 I have not built the dam any higher; I have widened it out with a scraper. * * * That dam is about 120 feet long, or maybe 150 feet. * * * I was present last Sunday when it was measured. Mr. Pearson and Mr. Clark were with me. We had a gas tank rule to measure it by. It had inches on it, yes. We laid a stick on the dam and let it stick out. We measured it level with this stick; it measured 21½ inches on the outside. That was the side next to the road. * * * In repairing the dam I used a scraper and widened it out. * * * I repaired it because they kept cutting the dam all along. * * * I don't know who cut it; I didn't catch them. It looked like Frank Hubbard who was cutting it; that was years ago. It has been cut at different times at least a dozen times, or a dozen and a half times. When it would be cut there was water above it. This cutting it would give drain across the road for the water and would throw the water in onto our land. I had crops down in this field. * * * Our land is a basin like; it is high on the west side and shows to be high on the east side. * * * The Bunch land looks a little bit sloping from the northwest to the southeast, but not very much. I know of some ditches being cut in there changing the natural course of the water. * * * They were cut on the Hubbard farm * * * now the Bunch farm. The ditches were cut south and southeast. That threw the water down to that you might say at the south end of the pond; to the pond on the Hubbard, or Bunch, farm. I saw some ditches from that pond down towards our place in about May 21 or May 21, 1924 (1923), somewhere along about there. I was on the south side of my mother's farm, and I could see three or four men around working around where this bridge was. I went up there the next day, and I saw where they

had cut a ditch up to the Bunch fence from the north. The ditch came from the north down to the Bunch fence. I believe that ditch was sixty inches wide and I believe it was thirty inches deep. That ditch drained the water from that lake to the road towards our land. * * * The ground where the fence is on the Bunch side is·higher than the land north of it, yes. It is a foot and a half or two feet higher; so they ditched it down to that fence and under it into the road. Later· on, I have forgotten what day it was, it was the same month, they opened it up under the fence and cleaned it out under the bridge and filled dirt back into the road with a scraper. I talked to the boys who did the work. It was Mr. Bunch's son and two of his nephews. That drained the water to the road. They cleaned out the drain in the road. That drained the water in the road and let our dam hold it. Later on they cut the dam under our fence and threw water into our field. Water ran into our farm then. I·had growing crops on it at the time. I had growing corn there which was two and a half and three feet tall, and I had plowed it two or three times and it was in good shape. The flood of water ruined that corn, you might say. I stopped the dam up where they cut through it there. I filled it up with a shovel. I did not build it up any higher than it was before; and I didn't build it any broader.' That stopped the water from coming in on our farm. They brought this injunction suit against us in 1924; I was served with that injunction. .The dam was cut after I was served with this injunction; it was cut three times after the injunction suit. I had not done anything to dissipate that injunction. I don't know who cut this dam. * * * I was in Weatherford when the dam was dynamited. That is seventeen miles from Weatherford. When I got home I discovered the dam was blown up and the water was running through, and I reported it. I did not build it any higher and never have built it any higher. The highest place in that dam is 21½ inches. * * * I repaired the dam after it was dynamited, but didn't build it any higher. The ditching throws more water at the point near the dam and against the dam. The water never has run over the top of my dam, except when the dam was cut. * * * Before the county cut those ditches and before the ditches were cut on the Bunch land the natural flow of the water would scatter out, and that didn't do any damage to my land. I built the dam not to throw water on other people but to protect my crops by keeping it off my land, and I have not at any time built that dam any higher at any place."

Mrs. M. E. Thomas testified that she was the wife of Dave Thomas, deceased; that she was born March 7, 1854, and had known the place in question since the fall of 1875, before her farm was fenced or put in cultivation; that there had been no trouble until Mr. Hubbard commenced ditching; that: "I have seen the ditches on the Bunch land that throw water down at one place on me; it is kind of angling; it is southeast. That has a tendency to throw water on my place. There was a big pond there. Water came down in that swag years ago. They cut that ditch and threw it down along up there in that field. Water stood up there on that land. * * * I knew this land before it was put in cultivation. There never was a drain of any kind 'coming across there. I never did see any water course there at any time. The water would collect in this pond. When it rained· the water would collect in those ponds and would stand there until it sinks. * * * It (the dam) never has been built any higher. * * * I remember in 1905 when my husband had a law suit with Mr. Hubbard here in the District Court of Parker County. Since that time up to the time Mr. Bunch came down there was there any trouble with this water. The dam has been on my place all the years like it is now."

Both parties closed their testimony.