## CHICAGO, R. I. & G. RY. CO. v. MARTIN.
### No. 12422.

Court of Civil Appeals of Texas. Fort Worth.
Jan. 31, 1931.

Lassiter, Harrison & Pearson, of Fort Worth, and C. T. Gettys, of Decatur, for appellant.

H. F. Weldon, of Henderson, and H. E. Lobdell, of Decatur, for appellee.

CONNER, C. J.

This appeal is from a judgment in appellee's favor for $1,125, as damages, alleged to have been caused by the failure of the appellant railway to properly construct and maintain sufficient culverts, bridges, and outlets to carry away flood waters, as a result of which back-waters were caused to overflow appellee's land, depositing silt and sand thereon, to its great damage.

The defendant denied the material allegations of the plaintiff's petition. The record discloses that the plaintiff owns some 500 acres of land of an irregular contour located in Wise county, and that the appellant railway company's roadway is constructed along its north boundary line; that it has a bridge near the northwest corner of the tract, another bridge near the center of the north boundary line, and near the northeast corner of the tract appears to be some trestling, and yet farther east along the line bordering an adjacent tract of land is another bridge. A stream designated as Salt creek, originating at a distance not shown south of plaintiff's land, discharges its waters in the general course of north along the west line of plaintiff's tract. Another small stream called "Garrett creek," originating at a distance not shown east of plaintiff's tract, flows in the general direction of west, crossing part of plaintiff's land, and along the southern edge of the block of land claimed by plaintiff to have been damaged and passing out of the block near its southwest corner and thence west to an intersection with Salt creek; Salt creek thus being the conduit for the waters of both streams. Along the south boundary line of the block alleged to have been damaged is a lake designated as Salt Lake. It appears that the waters of Garrett creek enter the east end of Salt Lake and leave the lake in its onward course about the southwest corner of the block alleged to have been injured. There is evidence tending to show that the section of country drained by these small streams is sandy. As early as the year 1917 Salt creek began to fill with silt, sand, etc. It further appears that at a short distance south of plaintiff's land, and about where Garrett creek enters Salt creek, the course of the waters in Salt creek was diverted in an easterly direction into Garrett creek and thence on into Salt Lake which gradually as the years passed filled up with sand and silt, after which time the silt and sand overflowed on the southern part of plaintiff's tract and filled it up to a depth of several feet.

The section of country described in which plaintiff's land is located is known as the Salt Creek Valley.

Near the north boundary line of plaintiff's land and of the appellant railway company's line flows the Trinity river, and one of the contentions of the appellant was to the effect that during high waters the Trinity river over-flowed the section and backed its waters up against its line of road, pressing part of its waters back through its bridges to the south, thus causing the backwaters from which the sand was deposited.

The case was submitted to a jury upon special issues, which, together with the answers of the jury thereto, are as follows, to wit:

"By the term 'proximate cause,' as used in this charge, you are instructed is meant such a cause as in a natural and continuous sequence, unbroken by any new and independent cause, produces an event without which the event would not have occurred, and which event could have been foreseen under all of the attending circumstances. It need not be the sole cause, but it must be a concurring cause which contributed to the production of the result in question, and but for which the said result would not have occurred.

"Special Issue No. 1: "Did the defendant, The Chicago, Rock Island & Gulf Railway Company, maintain necessary culverts, or sluiceways under its roadbed along the North line of the plaintiff's lands, as described in the petition filed herein, as the natural lay of the land required for the necessary draining thereof from November 15th, 1925, up to November 15th, 1927? Answer Yes or No. Answer. No.

"If you have answered Special Issue No. 1, 'yes,' then you need not answer the issues hereinafter submitted to you; but if you have answered it 'No,' then answer the following:

"Special Issue No. 2: Did the plaintiff suffer any damages to his lands, described in plaintiff's petition, between November 15th, 1925, and November 15th, 1927, by reason of the waters of Salt Creek overflowing said lands and depositing thereon sand, silt, or other matter? Answer yes or no. Answer. Yes.

"Special Issue No. 3: If you have answered Special Issue No. 2 'No,' you need not answer this issue; but if you have answered said issue 'Yes,' then find and state: Was the defendant's failure, if it did fail, to maintain necessary culverts and sluiceways under its roadbed at or near the plaintiff's land as the natural lay of the lands required for the draining thereof, the proximate cause of damage, if any, to plaintiff's land by said waters during the time from November 15th, 1925, till November 15th, 1927? Answer Yes or No. Answer. Yes.

"Special Issue No. 4: If you have answered either of Special Issues Nos. 2 or 3 'No,' you need not answer this issue; but if you have answered both issues Nos. 2 and 3 'Yes,' then find and state what amount of damages, if any, did plaintiff suffer to the land in question from November 15th, 1925, till November 15, 1927, by reason of the waters from Salt Creek overflowing the same and depositing thereon sand, silt, or other matter? Answer in dollars or in dollars and cents. Answer. $1,125."

209

A number of exceptions were taken by the defendant to the court's charge. Among others, the fourth issue was excepted to on the ground that "such issue is too broad in directing or permitting and suggesting that the jury assess and include all damages done to lands in question resulting from such overflowing waters when the evidence shows that defendant was not the cause of all such overflows or the full extent of such overflows as said lands received; because said issue does not submit any proper measure of damage, but permits and directs the jury to measure the damage by any standard and by any measure that they may see fit, including any and all items that may appear to their fancy, and without being limited to any portion that may have resulted from any failure to provide or maintain sluiceways."

The evidence does not advise us of the date of 'the construction of appellant's railway line or of the condition of the surface traversed in the immediate locality, and, while the plaintiff alleged destruction of crops, there is no evidence sufficient to support this allegation. The plaintiff testified that, in the spring of 1926, 25 acres of this land had been cultivated, from which he secured one bale of cotton, but no corn. His testimony does not show that any of the crop had been destroyed by overflow water or by the deposit of sand.

■ The measure of damage alleged by plaintiff, and the damage, if any, shown in the evidence, is the difference in the value of the land before and after. In Ry. Co. v. Anderson, 79 Tex. 427, 15 S. W. 484, 23 Am. St. Rep. 350, is stated that, where a nuisance is permanent and continuing, the damage resulting from it should be all litigated in one suit and in such cases the measure of damages to land caused by overflow is the difference in the value of the land immediately before and immediately after such overflow, citing Owens v. Ry. Co., 67 Tex. 679, 4 S. W. 593; Ry. Co. v. Green, 44 Tex. Civ. App. 247, 99 S. W. 573. Writ denied.

Among other things, O. W. Hunn, one of the plaintiff's witnesses testified that he was the county engineer and had been a civil engineer about 15 years; that he had had occasion to investigate and observe the drainage of the plaintiff's land; that they were now constructing a road in that vicinity. He further said:

"That land up there in that valley indicates it has been settling and depositing in there for many years. That is a sandy country back south of there, sand and clay, and sand washes down those hills into the valley and spreads out over that. * * * That country down there really needs a channel cut down over the land and north of the railroad clear to the Trinity River, clear to the old channel of the river. Until something like that is done that country down there will be overflowed. The water runs in there at the railroad and runs back there through those bridges and necessarily creates a flooded condition in there and will exist until a channel is cut clear to Trinity River through the bottoms north of the railroad, as well as through the bottoms south of the railroad; both of them will have to be cut before you can let the water out, or give it speed to get out, or it won't get out regardless of the bridges on the railroad track. If the railroad was moved out of there that would be the condition; until you cut some channels you will have deposits there; and it would be an overflow section all back up that creek, yes, undoubtedly would. That condition has existed there for a number of years as far as I can tell. I don't think it can possibly be cured until there is a channel into the river. That would be some distance north of the railroad clear across that valley north of the railroad. Until that is done it would do no good for the railroad to move or make any changes in its bridges or anything else. It is checked down there and has become a flood basin, that whole area, both north and south of the track at this time, and necessarily was already away back up the creek, up past our road. * * * The railroad bridges or the conditions there would not have caused trouble over there in the Trinity River, its getting out of its banks and coming over towards that creek; it couldn't be responsible for that. That has happened from some other cause. When that happened that necessarily threw a fill next to the railroad north of Mr. Martin's land, yes.

"Q. It naturally filled up and caused that land in that valley, that part of the basin, to fill up to whatever extent it has filled in there? A. That would be one reason for it, yes. That is proof of it, when that river got over there and spread out and threw its waters against this railroad it necessarily carried silt, and debris and caused those deposits to be made around there, yes, that is what caused it. And it formed the waters of the creek. The action of it was necessarily to throw the waters back up in that creek; that is the tendency. It overflowing there necessarily carried silt and sand and deposits into the channel of Salt Creek; it was carried in there and helped fill it up; and the fill was due to some trouble over there in Trinity River; I don't know what the trouble was. It was some trouble besides the bridges over there. The bridges didn't cause the river to get up. * * * When the water comes in from Trinity River and over to the railroad and into the mouth of this Salt Creek and pushes river waters back there through that bridge on Salt Creek, certainly that has a tendency to hold the waters back in Salt Creek. That would be one cause causing the silt and sands to settle up there. That would have that effect regardless of the presence of the railroad there; it would necessarily have the effect."

■■ We think there can be no question but that the indicated objections to special issue No. 4 were well taken. In addition to the testimony above quoted, there was other testimony tending to show that the damage claimed, if any, was not caused wholly by insufficient causeways in the embankment of the railway, but in part at least by reason of the gradual and long-continued erosion of the watershed and the filling and leveling of the natural drainage channels by flood waters. The plaintiff's action was predicated upon allegations to the effect that the damage was the proximate result of insufficient openings, but, if the injury complained of was caused in part by other things, the railway company can only be held liable for the portion of the injury proximately caused by waters impeded by it. See Ry. v. Vogt (Tex. Civ. App.) 181 S. W. 841; Ry. v. Wright (Tex. Civ. App.) 195 S. W. 605; Ry. v. Gurley, 37 Tex. Civ. App. 283, 83 S. W. 842; Taylor v. Ry., 36 Tex. Civ. App. 658, 83 S. W. 746.

■ The defendant sought to correct the objections to the issues mentioned by his special charge No. 3, which the court refused, and to the refusal of which exception was taken and error here assigned. That charge was as follows: "Gentlemen of the jury: If you believe from the evidence that plaintiff's said lands, or any of same, were damaged by rains that fell after December 15th, 1925, and before the filing of this suit, and that such lands would have been inundated and damaged to some extent by such rains irrespective of the presence or condition of defendant's railroad embankment or openings through same, then you are instructed that even if you should believe further from the evidence that the presence or condition of the embankment or opening therein held back or caused to be held back and diverted over plaintiff's said land additional waters in sufficient amount to cause additional damage to such lands in excess of the damage that would have resulted irrespective of the presence of said railroad, and if you find the evidence before you does not show or enable you to determine therefrom what portion of the damage was proximately caused by the presence or condition of said railroad embankment in question, you will not undertake to assess any damage based upon mere surmise and speculation in response to special issue No. 4 in the Court's Charge."

The authorities already cited indicate, we think, that this charge should have been given, and, because of the errors indicated, we think that the judgment must be reversed. In view of another trial, however, we will also notice that objection was taken to the court's definition of "proximate cause."

■ It will be noticed by its reading the definition imposes liability for events which "could have been foreseen under all of the attending circumstances." As hereinbefore stated, the condition of the Salt Creek Valley and its watershed and streams at the time of the construction of appellant railway company is not shown, and it was only required to use due care to provide such embankments and causeways for the escape of flood waters as from the history of the country or other circumstances could reasonably be then seen. The evidence in this case shows but two occasions when the waters from Salt and Garrett creeks accumulated at great depths on the south side of the railway embankment, and we cannot say from the evidence before us whether there were at any previous time floods sweeping over Salt Lake Valley of the same character.

In view of another trial, we also call attention to appellant's objection to the testimony of the plaintiff, Martin. He was asked the following questions and gave the following answers: "Q. Are you acquainted with what the reasonable market value of your land was per acre during the period from November 1925 up to the Spring rains in 1926; are you acquainted with the reasonable market value of your land what it was at the time and in its then condition? A. I don't think I could say. I think I am acquainted with its present market value. I know of the sale of lands down there in the last year or two. I know of three tracts. As to whether I know of that myself or whether it is just hearsay, I know of the parties interested; some of them told me about it, the man that sold the land told me about it. Certainly, all I know is what they told me; I didn't see the closing of the deal. I had no connection with the deal and was not present when made. It was not land in that Salt Creek Valley. It was what you would call the Paradise trade territory. Part of it was up-land, and some of it valley land, the part sold. It was a different character of land from my land. What I have heard relative to those sales I have mentioned, is all I know about the lands there; that is all I know is what I have heard."

He was then permitted to testify that "I would say the reasonable market value of my land per acre in 1925 and 1926 was $20.00 per acre. The reasonable market value of my land per acre at the time of the filing of this suit was about $12.50 per acre."

■ We think the witness was not qualified to testify as to the values, and that the court should have sustained the objections to the testimony. See Humble Oil & Refining Co. v. McLean (Tex. Com. App.) 280 S. W. 557, and J. B. Watkins Land Mortgage Co. v. Campbell et al., 98 Tex. 372, 84 S. W. 424, therein cited.

Objection was also made to testimony of other witnesses who testified as to values, but we think the authorities cited will be sufficient guide for the action of the court upon another trial.

██ We also suggest that defendant was entitled to have its special issue No. 1 submitted. In this issue the jury was requested to determine from the evidence whether "the waters of Trinity River, since November 15, 1925, during the two years just after said date flowed from the north through the openings under the bridges of defendant's railroad * * * and caused plaintiff's said lands in the bottoms of Salt Creek to be overflowed." That was one of the defenses urged in behalf of the defendant, and defendant was entitled to the instruction under the decision of Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517, and Gammage v. Gamer (Tex. Com. App.) 213 S. W. 930. We also think that under the authorities just cited the defendant was entitled to have submitted his special issue No. 7, presenting the inquiry as to whether "those parts of plaintiff's lands that are now subject to overflows become so far subject to overflows and set with grasses, prior to November 15, 1925, as to render the same more valuable for pasture purposes than for tillable purposes?"

The evidence tends to show that no more than 25 acres of the land in controversy was ever cultivated, and that the last attempt to cultivate this 25 acres was in 1926, from which the plaintiff got $25 worth of cotton, since which time it has not been rented for farming purposes. There was further testimony tending to show that since 1925 and since the land has been covered by silt and sand a good coat of Bermuda grass has grown thereon, and in the opinion of one or more of the witnesses the land is more valuable for grazing purposes than it would be for general farming use. There were some other special issues and special charges requested, but one or more of them perhaps are sufficiently covered by the special issues above noted.

We conclude without further discussion that the judgment should be reversed, and the cause remanded for another trial not inconsistent with this opinion.

BUCK, J., not sitting.