In the Matter of COUNTY OF WESTCHESTER, Relative to Acquiring Title to Real Property Required for Parkway or Boulevard Purposes.

Supreme Court, Special Term, Westchester County, November 10, 1953.

*Harry G. Herman, County Attorney* (*Francis J. Morgan* of counsel), for County of Westchester, petitioner.

*Jacob Eichel, Raphael P. Koenig* and *Milton H. Spiero* for Brontown Realty Corp. and others, respondents.

EAGER, J. This is a condemnation proceeding instituted by the County of Westchester to acquire lands for parkway or boulevard purposes. The proceeding is instituted under the provisions of article 8 of title B of the Westchester County Administrative Code (L. 1948, ch. 852). Judgment of condemnation was duly rendered herein and, pursuant to such judgment and the said code, the matter of the compensation to be paid to the owners of the property taken in the proceeding is to be determined by this court without a jury. It is conceded that the sole question presented to the court is as to the amount of damages to be awarded the respondents. The allegations and proofs of the parties have been duly heard and the court has duly viewed the property taken.

The sole problem here is the fixing and awarding of the compensation payable for the taking of the premises in question. Under the express provisions of the Westchester County Administrative Code, the owners of the premises are entitled to have awarded to them the equivalent of the actual loss sustained by them by reason of the taking of the subject real property. (See said Code, § 101, subds. 6, 9.) The payment to them of the amount of such loss would comply with the constitutional guarantee of " just compensation " directed to be paid for the taking of private property under the right of eminent domain. (See U. S. Const., 5th Amendt.; N. Y. Const., art. I, § 7.) The respondent owners in this proceeding should receive the equivalent of such loss, and no less. Such is the measure of the obligation of the county and no more.

The special facts before the court do, however, present unusual questions. The property taken (hereinafter referred to as the " subject parcel ") was a parcel of 4.769 acres, which was originally a part of a tract of 26.239 acres. Such tract had been contracted for on October 15, 1946, and acquired on April 27, 1947, by two brothers, William and Harry Kalker, at a total cost of $80,000, for the purpose of development into a two-story multiple dwelling garden project under section 608 of the National Housing Act (U. S. Code, tit. 12, § 1701 et seq.). This proceeding was instituted and the notice in condemnation, petition and notice of pendency herein filed on February 7, 1950. The petition and notice herein were served on the respondent Brontown Realty Corp. on February 8, 1950. In the meantime, the owners had in good faith proceeded toward the development planned. Architects and civil engineers were engaged in 1947, for this purpose, and a project was duly set up and fully planned, calling for the erection of twenty separate two-story garden type

apartment buildings upon the tract with necessary streets and sewer and water lines. The buildings were to contain 527 apartments, with a total of 1931½ rooms. Also, provision was made for two subterranean garages under certain of the buildings to contain garage space for 244 cars. As originally planned, there were to be five of the apartment buildings containing 238½ rooms on that portion of the tract contained within the boundaries of the subject parcel of 4.769 acres.

In January of 1949, applications were duly made by said Kalker brothers for mortgage insurance under said National Housing Act for the purpose of financing the project, and in May, of that year, the applications were approved and commitments were duly issued by the Federal Housing Administration for mortgage insurance in the sum of $4,436,500, later increased to $4,644,300.

In accordance with the regulations of the Federal Housing Administration, a new corporation known as Brontown Realty Corp. (hereinafter designated as Brontown) was organized on or about December 9, 1949, and the entire tract of 26.239 acres excepting lands required for streets and utility easements was conveyed to it on December 21, 1949, free and clear of all encumbrances. It is important to note here that Federal Housing Administration required that the sponsors guarantee to build all the streets and so-called off-site utilities out of their own funds — (that is, no provision was made for use of Federal Housing Administration funds for that purpose). Because of this requirement, certain portions of the entire tract, particularly land to be occupied by streets, sewer lines and water lines, were not conveyed to Brontown but remained the property of the individual respondents William and Harry Kalker.

William and Harry Kalker and Brontown proceeded in good faith to carry out the project. William and Harry Kalker started the laying out and construction of the necessary off-site utilities (streets, sewer lines, water lines, etc.). Brontown proceeded with the work of constructing the apartment buildings. The services of a civil engineer and of a construction engineer were engaged. Permits for the improvement were duly issued by the local authorities on December 12, 1949. During a period of from October 19, 1949, to the time of the filing of the notice of pendency of the proceeding, many and divers contracts were made by the said Kalker brothers and/or Brontown with various persons and firms for necessary work and materials to carry out the project.

The actual work on the ground was started in November, 1949, and, at the time of the filing of the *lis pendens* on February 7, 1950, the project was approximately one eighth completed. As of such date, excavation for a greater portion of the proposed buildings had been substantially completed; footings and foundation-work had been completed for nine of the buildings; the framework on four of the buildings (included within the nine) was substantially completed; and the brickwork on one of the buildings had been completed.

As stated aforesaid, the plans called for the erection of five of the apartment buildings on the subject parcel, that is, upon the portion of the tract which was later condemned. The work on the ground with respect to these particular buildings was never, however, actually started. The construction superintendent testified that the work on this location was not immediately started because it was heavily timbered. In fact, the only work in connection with the project which was performed on the subject parcel consisted of the installation of those sections of the storm drain and of the sanitary sewer line for the project which traverse a portion of such parcel and enter respectively into a brook (the Bryn Mawr blowoff) and a Yonkers trunk sewer line on said parcel. The work of installing the drain and sewer line was performed prior to the institution of this proceeding. Sometime after the beginning of the proceeding and prior to the vesting of the title in the County, two large piles of rock debris were dumped on the subject parcel, being material excavated in connection with the construction of certain of the buildings on the residue of the property.

The mortgage loan was in due course and on December 12, 1949, closed with the Federal Housing Administration and the County Trust Company (the temporary lender) and advances under the mortgage totaling about a half million dollars were made to Brontown prior to the filing of the notice of pendency of this proceeding. Further advances due in the ordinary course were, however, temporarily held up because of filing and the pendency of the proceeding.

From the foregoing, it appears, and the court finds, that on February 7, 1950, when the notice of pendency of this proceeding was first filed, and on the following day when the petitioner served notice of the proceeding upon Brontown, the subject parcel (4.769 acres), was an integral part of the larger tract of 26.329 acres which was then under development as the site of a multi-million dollar two-story garden apartment housing project. The tract, including the subject parcel, was, there-

fore, property of unusual value as of the time of the institution of the proceeding. The commitment for the FHA (i.e. Federal Housing Administration) mortgage, providing for necessary financing of the project on especially favorable terms, gave the property exceptional value. The mortgage commitment was itself an asset of special value to the property owners. In fact, it appears that the mortgage which was taken temporarily by the County Trust Company, was resold by it on June 28, 1951, to the New York State Employees' Retirement System as permanent mortgagee, at a premium, amounting to $127,183.93, which was payable to Brontown.

It is the claim of the respondent owners, therefore, that the value of the subject parcel is to be determined as of February 7, 1950, when it was an integral part of the proposed development. The County, however, contends that the value of the subject parcel is to be determined as of July 12, 1951, when title thereto vested in the County. In the meantime, additional adjoining lands had been acquired by Brontown and the project completed at a considerable extra expense without the use of the subject parcel. Therefore, the value date is a special problem in the proceeding.

Upon receiving formal notice in February, 1950, of the proposed taking of a part of the land needed for the development, Brontown claims it proceeded upon a course to have the effect of minimizing its damages. It arranged to purchase additional land (approximately eight acres) adjoining the tract, revised its plans to provide for the construction of four buildings on a portion (about five acres) of the additional land to contain the units which were to have been erected on the subject parcel, and resubmitted the FHA mortgage loan for amendment and reprocessing.

The additional land was purchased at a total cost of approximately $42,000; a site engineer was engaged for a new layout, new surveys were made, the original plans were amended and new plans were prepared for the replacement of sixty-five apartment units upon the new site. Plans and specifications for the relocated units were eventually approved by the Federal Housing Administration, the mortgage commitment was accordingly amended in August, 1950, and the closing of the reprocessed loan took place on November 20, 1950. The subject parcel (the condemned portion of the tract) was released from the lien of the mortgage and the mortgage spread over the newly acquired land. Certain of the contracts for work and labor and for materials were revised or renegotiated, all at a higher rate and cost to the owner. As a result of the change in plans,

there was a delay of approximately nine months in completing the project, the same being completed on June 28, 1951.

Thus, the subject parcel was actually not used in connection with the completion of the project. In fact, the judgment of condemnation, which was entered on July 25, 1951, was not entered until after the completion thereof. In this connection, it appears that the proceeding was originally instituted solely against Brontown as owner of the subject parcel, and that the petitioner did not promptly enter judgment of condemnation because it discovered that William and Harry Kalker, not originally made parties to the proceeding, still owned certain portions of the parcel (to wit, portions to be used for streets and off-site utilities). Finally, a supplemental petition and notice of pendency were filed and served in June, 1951, for the purpose of making them parties. Judgment of condemnation was thereupon granted without opposition and entered on the said 25th day of July, 1951. Such judgment expressly provided that title should vest in the County of Westchester as of July 12, 1951, and said judgment further provided " that compensation be made to the owners of the property so taken as aforesaid with lawful interest on the awards duly made from the date of vesting of title, namely, the 12th day of July, 1951." This judgment stands and was not appealed from. Therefore, the taking date is conclusively established as July 12, 1951. Such date was also agreed upon by the parties as the taking date.

In view of the fact that as of the taking date, the project was completed without the use of the subject parcel, the County, in effect, takes the position that the subject parcel is just so much vacant land held with the particular development and to be valued as such, giving due consideration, of course, to its availability for use in connection with the development. The County further contends that the expense incurred and loss, if any, sustained by the respondents, in the matter of acquiring additional lands, the amendment of the FHA mortgage commitment and the rewriting and extension of contracts for work and material in order to carry out the proposed project, and the delay caused thereby, may not be considered in determining the compensation to be awarded.

Counsel for the respective parties have furnished the court with excellent briefs. The applicable decisions referred to have been reviewed by the court. Let it be said that following such review, the court has arrived at the conclusion that the position of the County must, in the main, be sustained. It was *land* only that was appropriated by the County under the power of

eminent domain. Incidentally, it is true that the completion of a most valuable project involving the use of such land was placed in jeopardy by the proposed taking thereof and that eventually such project was completed solely by reason of a change of plans and a delay which were costly to the owners. The additional expense occasioned to the owners by such change in plans and the delay, and the amount of the owners' incidental loss and reduction of profits by reason of such expense and delay, if any, may not, however, under the circumstances be added to the amount of the award to be made herein for the land taken.

The original FHA mortgage commitment and the contracts for the furnishing of work and materials to the owner of the lands for the carrying out of the proposed housing development, though concededly valuable assets, were not an estate or interest in the realty taken nor a part thereof. They were to be frustrated by the proposed taking by the County, but not taken by it. In fact, it is specifically provided by the applicable statute that, upon vesting of the title in the County by virtue of a judgment of condemnation, all contracts or negotiations with contracting parties touching the property or any part thereof shall forthwith respectively cease and determine and be absolutely discharged. (Westchester Co. Administrative Code, art. 8, tit. B, part 1, § 108.) And no provision is made for the payment by the County, as condemnor, for the loss sustained, if any, by reason of the frustration. The general rule applicable is stated in Nichols on Eminent Domain (Vol. 4, § 13.33, p. 276), as follows: '' The taking of the land terminates all contracts in respect to its use and the owner is under no liability for his failure to carry out such agreements. It is equally well settled that the owner is not entitled to compensation for the loss of his contracts. No distinction has been drawn between a damage to business caused by making impossible the performance of existing contracts and a damage consisting of the loss of expected contracts. If an owner of land taken by eminent domain is not entitled to compensation for the loss of profits on his contracts, existing and expected, taken as a whole — that is, injury to his business — *a fortiori* he is not entitled to compensation for the loss of expected profits on a single contract.''

It is said to be the well-settled rule that while it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken, not all losses suffered by the owner are compensable under the constitutional or a statutory requirement of just compensation. (*U. S. ex rel. T. V. A.* v. *Powelson,*

319 U. S. 266, 281.) In the absence of a statutory mandate, the taker must pay only for what it takes, not for opportunities the owner may lose. It is well settled that " ' Frustration and appropriation are essentially different things.' " (*U. S. ex rel. T. V. A.* v. *Powelson, supra,* 281, 282.) Here, in the proceeding at bar, there was to be no taking of the owners' proposed housing development or of their FHA commitment in connection therewith. Therefore, there was no responsibility upon the County for the owners' expenses in connection with the subsequent modification or change in the proposed development and in the mortgage commitment inasmuch as such development and commitment were not part of the realty. The incidental damages sustained by the owners in the premises were *damnum absque injuria.*

The respondents in the case at bar were, in effect, compelled to remove part of their proposed project from one location to another, but such fact does not make the cost of that removal an item of damage. Judge CRANE, writing for the Court of Appeals in *Banner Milling Co.* v. *State of New York* (240 N. Y. 533, 540), says: — " Taking the land may cause the owner inconvenience and loss by compelling him to remove his business to some other place. Such loss, however, is not recognized as part of the damage or compensation which the State must pay for the land taken."

The respondents make the point, however, that the acquisition by them of additional land and the change in the plans and contracts to carry out the development with the use of such land instead of using the subject parcel were steps taken for the purpose of mitigating damages. Therefore, the respondents say that the County is liable for the additional costs and expenses incurred in connection with the change in the plans and the completion of the project in accordance with such change, and also for the loss sustained on account of the delay in completing the project because of such change. The court, however, rejects this claim of the owners because, as heretofore pointed out, the County could not properly have been held liable for the failure of the project in the event the taking of the subject parcel caused such failure. This, because such project would be incidentally frustrated and not taken. The County may not be held liable for costs and expenses to mitigate damages for which it would have no liability in the first instance.

Now, in fixing the compensation payable to the respondent owners, it is to be borne in mind, that they are entitled to receive the greatest value of the subject parcel for any available

use to which it may be put. This parcel clearly has its greatest value as part of the entire tract owned by the respondents at the time of the taking. Therefore, the respondents are entitled to an award of the difference between value of the entire premises and improvements owned by them before the taking and the value of the remainder of the property after the taking, together with the consequential damages, if any, resulting to such remainder by reason of such taking and by reason of the use to which the parcel taken is to be put by the County. (See, *Matter of City of Rochester* [*Smith St. Bridge*], 234 App. Div. 583; *Matter of City of New York* [*Fourth Avenue*], 255 N. Y. 25; *Matter of City of New York* [*Rockaway Beach*], 288 N. Y. 75, and *Adirondack Power & Light Corp.* v. *Evans,* 226 App. Div. 490.)

The court has further concluded that such difference in value and such damages, if any, are to be determined as of the time of vesting of title to the subject parcel in the County, to wit, as of July 12, 1951. The institution of the proceedings and the filing of the *lis pendens* in February, 1950, merely put the respondents on notice that the County was about to take a portion of their premises. The respondents presumably then knew that the law would require the payment by the County of the value of the subject parcel and consequential damages as of the time title passed. If the County unduly delayed the taking of title, the respondents had the right to compel it to proceed or have the proceeding dismissed and the *lis pendens* cancelled. There is generally some lapse of time between the institution of a condemnation proceeding and the taking of title by the condemnor, but there is no basis for an award for delay in appropriation. Such is the general rule in this State and the parties to condemnation proceedings are bound thereby, and must act accordingly.

It is the well-recognized general rule in the law of eminent domain that, in the absence of special statutory provisions otherwise declaring, the date of the appropriation or expropriation is the value or damage date. In other words, the date on which title passes or injury is done is the date when the money must or should be paid and the amount thereof determined. ( See 29 C. J. S., Eminent Domain, § 185, p. 1068; *Parks* v. *City of Boston,* 15 Pick. [Mass.] 198; *Matter of Mayor of City of N. Y.,* 40 App. Div. 281, 284; *Matter of Simmons* [*Ashokan Reservoir, Sec. No. 7*], 130 App. Div. 356, 359, affd. 195 N. Y. 573, affd. *sub nom. McGovern* v. *New York,* 229 U. S. 363; *Matter of Board of Water Supply of City of N. Y.,* 277 N. Y. 452, 456, 457; *Matter of City of New York* [*West 10th St.*],

267 N. Y. 212, 220, and *Matter of City of New York [East River Drive]*, 264 App. Div. 555, 560, affd. 298 N. Y. 843.)

For instance, it was said by Chief Justice SHAW in an early Massachusetts case (*Parks* v. *City of Boston,* at p. 208, *supra*): " The true rule would be, as in the case of other purchases, that the price is due and ought to be paid, at the moment the purchase is made, when credit is not specially agreed on. And if a pie-powder court could be called on the instant and on the spot, the true rule of justice for the public would be, to pay the compensation with one hand, whilst they apply the axe with the other; and this rule is departed from only because some time is necessary, by the forms of law, to conduct the inquiry; and this delay must be compensated by interest. But in other respects the damages must be appraised upon the same rule, as they would have been on the day of the taking.''

The constitutional requirement of just compensation is said to be met by the payment of the fair market value of the property taken as of the date of the taking. (See *Matter of Board of Water Supply of City of N. Y.,* 277 N. Y. 452, 456, and *Matter of Simmons [Ashokan Reservoir, Sec. No. 6]*, 130 App. Div. 350, 359.) It is said to be a well-established principle that a person whose property is taken by virtue of the power of eminent domain " is entitled to be paid only the value of the property, considering it in its condition and situation at the time it is taken.'' (*Matter of City of N. Y. [West 10th St.]*, 267 N. Y. 212, 220.)

The decisions having to do with a proceeding under the Condemnation Law of this State, or under a special statute containing provisions for the vesting of title upon payment, may be said to recognize and to be in accordance with general rules above mentioned. In such a proceeding, the last date upon which any intelligent appraisal of what will be taken can be made is the date of the report or award by the commissioners. This is always some time before the title date but it is the nearest to the title date that the commissioners can approach without stultification, and accordingly, is held to be the value date on which awards under the laws indicated must be made. (*Matter of City of New York [Titus Street]*, 139 App. Div. 238, 239; *Matter of Brooklyn Union Elevated R. R. Co.,* 105 App. Div. 111, 113; *Matter of People of State of New York [Hudson Riv. Toll Bridge]*, 81 Misc. 324, 326; 83 Misc. 331, 332–333.)

A recognized exception to the general rule exists where the condemnor, under legal authorization, entered into possession of the realty before he takes title. Under such circumstances,

the value date is moved back to the date of compliance with the legal conditions for possession before title. (29 C. J. S., Eminent Domain, § 185, p. 1071; *Matter of Nassau Elec. R. R. Co.* [*Cabot*], 173 App. Div. 253, 255; *City of Binghamton* v. *Taft,* 125 Misc. 411, 415; *City of Corning* v. *Stirpe,* 262 App. Div. 14, 15, affd. 293 N. Y. 808.) The same kind of reasoning has been applied to cases where a trespass amounting to an exclusive appropriation has been committed innocently by a legal entity with a power of condemnation (*Kingsland* v. *Mayor of City of N. Y.,* 51 Hun 639; *Syracuse, Lake Shore & Northern R. R. Co.* v. *State of New York,* 175 App. Div. 264, 267). In the case at bar, however, the County did not enter upon or take possession of the subject parcel prior to acquiring title, and, in fact, was not entitled to possession until the entry of the judgment of condemnation.

A review of the decisions leads to the conclusion that the rule generally to be applied in condemnation proceedings in this State is that the title vesting date or possession date, whichever is the earlier, shall be regarded as the value fixing date. Special provisions by statute may, of course, render such rule inapplicable in a particular case. The special statute applying to the proceeding at bar (Westchester Co. Administrative Code) does not, however, contain any provision inconsistent with the application of the general rule. In fact, such statute gives indication that the title date or possession date, whichever is the earlier, is to be regarded as the value and damage fixing date. For instance, it is expressly provided therein that the award shall bear interest from the date the County enters into possession or from the date of the vesting of title in the County, whichever is the earlier. (See Westchester Co. Administrative Code, Art. 8, tit. B, § 107.) The determination finally reached is that the general rule aforesaid applies to proceedings under the Westchester Code.

Having set forth the principles of law guiding this court in its decision, it will determine the ultimate issues of fact. Just prior to the taking on July 12, 1951, the defendants owned approximately 26.7 acres of land (excluding area occupied by streets and conveyed to the City of Yonkers). The premises were used in the main as an apartment house development. On the tract were nineteen two-story garden type apartment buildings. The buildings contain altogether 527 two, three and one-half and four and one-half-room apartments with all modern improvements renting from $70 to $122 per month. There are two subterranean garages providing space for 262 cars. The

development is well located in a large industrial city. The cost of planning and constructing the same, exclusive of land, was approximately $4,750,000. The cost of the land was altogether approximately $120,000 (including area occupied by streets and roads and later conveyed to the city). The property can reasonably be expected to produce a total annual rental income of $600,000, with estimated reasonable annual expenses, maintenance charges and depreciation of $350,000.

The subject parcel severed by the taking (4.769 acres) is fully described in the judgment herein and the court adopts such description. It was situate on the southerly end of the premises. It fronts 468 feet on Central Park Avenue which is a main thoroughfare. The parcel is a rough, unlevel and partly wooded tract. There were no buildings or improvements thereon. It was, however, subject to four certain easements, extending upon or through the same, to wit:—(1) The Bryn Mawr blowoff easement, thirty feet in width, occupying an area of approximately one-half acre and containing an open brook to carry off water from New York City reservoir system; (2) The City of Yonkers sanitary sewer easement, fifteen feet in width, the sewer being installed below ground, and the easement occupying an area of approximately one fifth of an acre; (3) The Brontown Realty Corp. sewer easement, ten feet in width, with the sewer line under ground; and (4) The Brontown Realty Corp. storm drain easement, ten feet in width, with the drain under ground. The title acquired by the County is subject to such easements.

The court values the entire premises of the defendants (as a complete unit, land and buildings), prior to the taking at $5,000,000, and the remainder of the premises after the taking at $4,950,000. In fixing such values and the award herein, the court has taken into consideration the fact that sales of unimproved tracts of land comparable to the subject parcel and equally well located, averaged from $5,000 to $6,000 an acre within a reasonable time of the taking. The fact, however, that the subject parcel was a part of and held with the particular larger improved tract gives it more value than it would have if it were an isolated unimproved tract.

There is no proof of any consequential damages to the remainder of the premises by reason of the taking or by reason of the use to which the subject parcel is to be put by the County, so none is allowed. However, in addition to receiving the difference between the before and after values above noted, the respondents, in the opinion of the court, are entitled to be

compensated for that portion of their expenses, reasonable in amount, as may be found to have been incurred and paid by them in connection with the proposed development of the subject parcel as part of the original tract. These expenses consist of fees of engineers and architects for that portion of the surveys and plans *as related solely to the subject parcel and the proposed buildings thereon;* the fees of test borers for test borings *on the subject parcel;* and such proportion of attorneys' fees incurred in connection with the originally proposed development *as may be found to be fairly allocable to the subject parcel.* These expenses, found by the court to amount to $7,500, were actually incurred in good faith prior to the taking and *relate directly to parcel taken.* The provision of the special statute applying requiring that the respondent owners be paid " the equivalent or the actual loss " sustained by them by the taking of their property entitles them to recover these expenses in addition to the difference in values above mentioned. Such expenses having to do with the proposed development of the subject parcel and incurred prior to the taking thereof are clearly in a different category than the disallowed expenses and losses alleged to have been sustained by the respondents in the matter of the change of plans occurring by reason of the severance and in the matter of the completion of the development without the use of the subject parcel. Such particular expenses were not taken into consideration in fixing the values above-mentioned, and the amount of the respondents' loss in connection therewith would not.be recovered unless they be allowed as a separate item of damage. The allowance thereof, if in variance with any of the general rules hereinbefore set forth, is a justified exception in this case particularly in view of the special statutory provisions. In any event, it is decidedly true that each condemnation case necessarily involves different facts and is to be considered by itself, and further, that general rules are to yield in exceptional cases where necessary to properly compensate the owner for the land taken. (See *Banner Milling Co.* v. *State of New York, supra,* p. 546; *Matter of Board of Water Supply of City of N. Y., supra,* pp. 457, 458, and *Matter of New York & Brooklyn Bridge,* 18 App. Div. 8, 11, 12.)

The award therefore to the respondent owners is $57,500. Interest at the rate of 4% per annum from July 12, 1951, shall be added.

The motions of the petitioner to strike out the thirty contracts referred to at pages ninety-eight and ninety-nine of the minutes,

also exhibits AAA20 to AAA41, the testimony received at page 570 of the minutes, and the testimony of Edward Zwicker, are granted. The motions made at pages 797 and 800 of the minutes are granted. The motion to strike out the testimony objected to at page 589 and page 731 of the minutes is denied.

This memorandum shall stand as the decision of the court without the necessity of formal findings and conclusions.

Submit final judgment on notice.