Alexander Del Giorno, J.
The claimant herein purchased some 36 acres of raw land in Rockland County for $36,320 by deed dated March 7, 1952. He actually went into possession of the property in December, 1951, on the basis of his contract *122 to purchase and started planning a development known as “ Besen Park”, later to he known as “ Lake Estates”. He had surveys made, lots and roads staked out, trees cut down. He proceeded to build two model homes, set up his field office, hired the necessary persons to supervise the job of development and to deal with proposed purchasers, had descriptive literature made out and advertised in the New York Times. Most of these efforts were either completed or in an advanced stage of accomplishment before he took title.
During this period he also submitted his planned development to the Town Board of Ramapo and the State Department of Health for approval. Many changes were suggested by the Town Planning Board on the preliminary maps of the subdivision. The final approved map indicates that some 32 lots had been disapproved for building development by the State Department of Health because of improper drainage in those lots. The testimony shows that these lots could be approved on subsequent application if the subsoil conditions were changed to a degree permitting approval, and then could be utilized for home building. Claimant did most of these things before taking title.
He testified that he was proceeding with the development of his acreage for home building when on about June 27, 1952, he was advised by letter by the Monsey Heights Water Company that his application for a water supply on his development would not be processed further because the Thruway was coming through his property. Except for some little odds and ends performed to December, 1952, claimant did no more work on the development after June 27, 1952.
After receiving the letter from the Monsey Heights Water Company, claimant returned to prospective purchasers all the deposits on what he called “ binders ” for 36 houses. Meanwhile immediately after the above events of 1952, Besen went to Phillipsburg, N. J. where he bought land, developed 400 lots, built and sold 110 houses and finally sold outright 200 of those lots in 1954. He was a very busy builder and lost no time, for he completed quite a few developments in addition to Phillipsburg and disposed of the houses therein, all between 1952 and 1955. The so-called deposits, except for two, were applications for credit approved by the V. A. or F. H. A. They had no binding force. They do disclose, however, that the prices of the contemplated houses were in the range of $10,000 to $13,000. The two lots sold on contract were for specialty use by professional men.
*123 There were altogether 10 takings on the subject property. These occurred during the years 1954 and 1955, but the parties agree that the taking date should be as of December, 1955. The present Claim No. 34212, is an amendment of and supplemental to Claim No. 32701. In this present claim the claimant asks damages as follows:
Lots in whole or in part appropriated.............. $200,000
50' road beds appropriated and road system
destroyed..................................... 35,000
Remaining land damaged......................... 250,000
Other damages ................................. 1,000,000
Total damages .............................. $1,485,000
His proof, however, has been based on the quite different theory of original investment plus all costs allegedly involved in the development, plus loss of profits.
The trial moved slowly for the reason that there were too many theories advanced and too many tentative approaches made to the end desired. The court found it impossible to bring about any agreement between the parties whereby proof could be adduced along definite lines of approach without interminable discussions of many collateral issues. Nevertheless, in spite of all these unnecessary excursions into theory, hope and speculation, the fact is that the claimant did sustain damages for which he must be fairly compensated.
Claimant stated that he had bought 36 acres of raw land. He had a development map drawn by the engineer he engaged, from which resulted 91 lots to be built upon. He did build two sample houses on Monsey Heights Road and he retained nine lots on Route 59 for stores or a shopping center. Fifty-eight lots were finally approved on June 2, 1952 and 33 lots were unapproved by the State Department of Health for building thereon at that time. A part of the development was reserved for a proposed park and pond into which surface drainage water from the development would flow.
In arriving at values herein, the court considers that since June, 1952, when claimant was compelled to stop work on his development, until December, 1955, the agreed date of the takings, values of real estate increased in the Town of Ramapo. The claimant asserts that the increase was by 50%; the State says it was by 10%. The court feels that a fair increase was between 20% to 25%, which increase will be taken into consideration in the court’s evaluation.
*124 The Thruway took nine acres right through the development, which involved a number of lots, some of which were partly damaged. These will be itemized in a later part of this decision for the purpose of clarity. State’s Exhibit “ A ” presents an excellent and comprehensive tableau of the entire development with the various takings clearly indicated in colors.
The claimant is entitled to direct as well as consequential damages. The State originally contended that because only two houses (model homes) were built, the damage should be based on acreage and not on lots, as said lots are indicated in State’s Exhibit ‘1 A ” (which is actually claimant’s final development map, indicating the conditions upon which it could or could not be built upon certification thereof by the State Department of Health, and which also reflects the various takings as above stated). The State’s experts later found that claimant’s efforts justified approval on a lot basis rather than raw acreage, and so valued the property.
The testimony has made it abundantly clear that the claimant, before the Thruway taking, had filed said map and had submitted it several times and that in fact the map had been partially approved for building houses; that he had done enough work therein, such as rough grading of the roadways, staking out of lots, laying some subsoil drainage pipes and other work as to change the character of that acreage to lots. Therefore, the damage to the claimant may be based only upon the lots taken and consequential damages to the remaining lots in the development. What the value of each lot was, however, is something else to consider. On this basis I do not accept claimant’s proof of analysis of costs and disbursements allegedly incurred in achieving the transformation from acreage to lots, nor the claim for loss of profits which never existed. All that was spent, all that was done by the claimant properly resulted in creating the lots out of the acreage, to each of which then attached certain valuation, which then represented the then finished product of the original investment plus all these efforts and expenses in achieving the change from acreage to a subdivision, to which we also add the percentual change in values from 1952 to 1955, as aforesaid.
The evaluation of the land must be based on market value, not claimant’s expenditures, whether they be the usual expense of development or items such as traveling or entertainment expenses or an annual salary for the claimant or commissions for claimant’s nephew. Costs allocable to the land are not per se compensable except so far as the expenditures enhanced *125 the value of the real property. (Matter of County of Westchester, 204 Misc. 1031, affd. 285 App. Div. 1169.)
Nor may the court accept the claim that the Route 59 lots were worth more because they would be used for an imagined shopping center. Mr. Murdock, the realty appraiser for claimant, made much of what the claimant would have done with these lots, although he conceded that no plans were ever advanced for a shopping center. While he extolled the thought of a shopping center, he asserted that those lots, even if considered for residential use only, would have the same value as if used for commercial use. The court cannot agree with Mr. Murdock for “ Care must be .taken, however, not to substitute for reality the mere hope of the owner that the property might be used for some specific purpose.’’ (Matter of City of Rochester [Smith St. Bridge], 234 App. Div. 583, 586, citing Fowler v. State of New York, 234 App. Div. 166; Matter of Simmons [Ashokan Reservoir, Sec. No. 6], 130 App. Div. 350, 352, affd. 195 N. Y. 573.)
All realty experts agreed that the Route 59 lots have greater value because" of location and that their highest and best use would be for business purposes. The court also agrees with this concept. It will accord the claimant due consideration on that basis. However, the court has concluded from an analysis of the testimony and exhibits, supplemented by at least six personal viewings by .the court of the subject property and the surrounding communities that the location warrants a finding that the highest and best use for those lots on Route 59 would be for the building of neighborhood stores, but not the building of a shopping center as that term is understod today.
Sparkill Realty Corp. v. State of New York (254 App. Div. 78, affd. 279 N. Y. 656) contains an excellent exposition as to the value of property taken in condemnation proceedings and is applicable to the present claim. The court held that (p. 82): ‘ ‘ The value of property taken in condemnation proceedings is a question of fact. (Matter of City of New York [Fourth Ave.], 255 N. Y. 25.) It is settled beyond question that respondents are entitled to recover the fair market value of their property based on the most advantageous use to which it could be put. In this case appellant occupies the status of a purchaser. (Jackson v. State of New York, 213 N. Y. 34.) In order to arrive at an estimate of the fair market value of the property in question all those things which would be considered by a buyer and seller, neither under compulsion, neither having an advantage over the other, must be taken into consideration by a witness *126 competent to assemble, weigh and translate them into dollars and cents. All the facts and circumstances which a buyer and seller would consider in connection with the purchase and sale of a piece of property are relevant and material in arriving at a determination as to its market value. * * * When the State deprives the citizen of his property for a public use he should have the right to prove every element that can fairly enter into the question of market value. (Matter of City of New York, 198 N. Y. 84.) ”
And at page 84: “In eminent domain proceedings one who is deprived of his property should be permitted to prove all factors which are relevant in fixing its value. There is no well-considered case which holds that profits may never be considered as an element of value. Profits may be recognized as an important item and are only excluded in oases where the evidence is too speculative. ‘ Each case necessarily involves different facts and must be considered by itself. Only a few general rules apply on the question of valuation in condemnation proceedings, and even these may yield to exceptional circumstances. ’ (Banner Milling Co. v. State of New York, supra.) The usable value of the property for any suitable legitimate business is always relevant in fixing its market value. (Reisert v. City of New York, 174 N. Y. 196; Baumann v. City of New York, 227 id. 25.) ’’
At this juncture, the court takes cognizance of the location of the two model homes, their price classification, the size of the plot each was built on and what they sold for, in order that we may better leave the speculative heights of damages claimed and come down to earth on a fair value of damage sustained.
The larger of the two houses, the Hart House (Section C, Lot 3) lies on a plot 79.41 feet front on Monsey Heights Road, by 170 feet on either side, more or less. This lot is only 150 feet south of Route 59, is on a street long existing and properly paved and developed before the purchase by claimant, and has all available utilities. The smaller house, or Markey House (Section 0, Lot 2) is built on a plot 79.84 feet on Monsey Heights Road by 135 feet, more or less, on either side. It, too, enjoys all utilities available in that locality. It is separated from the first house by Mr. Kelly’s property, which is about 150 feet wide on its Monsey Heights Road frontage. The Hart plot was valued by Murdock, appraiser for Besen, at $3,000. The house was sold for $8,800. It had four rooms including two bedrooms. The Markey house was sold for $12,000. It had 5 rooms with garage. Murdock valued the Markey lot at $3,500. It may be said here that the testimony of Murdock was followed generally by Mr. Zimmerman, another realty expert for the claimant. The *127 latter’s testimony, although honestly proffered, the court found quite inept. Even Mr. Moses stated that such testimony was being offered for what it was worth.
Should we accept the claimant’s witnesses’ testimony of cost of material and labor which went into the building of the model homes and add them to the value of the land, it would seem that claimant was running a charitable institution for his purchasers, losing some $2,000 instead of making a fair profit on those houses. This would be so were we- to accept the much too exaggerated value of lots given by Murdock, which was based heavily on information furnished to him by Besen himself in addition to other conceptions of values quite unacceptable in his profession. The evaluations of lots Murdock gave were not based on comparable -sales but on what he felt was the value of lots in that neighborhood. He gave no comparisons of value even though there were similar developments nearby. He stated that the values given in his written report were based upon values placed on the lots by Mr. Besen who was operating as a builder in Rockland County for the first time. He even placed the value of the lots rejected for home sites by the State’s Board of Health on a par with the value of the lots approved. He also ascribed the same value for lots fronting on Route 59 whether considered on a residential basis or for business purposes. He gave 50% of the value of the lots as consequential damage because of Thruway taking and stated that the Thruway was detrimental to that extent. He conceded that within two miles there was a shopping center and that there were stores in the neighborhood within two blocks of the subject property. He conceded also that the two houses Besen sold were comparable to those in various other developments in the general neighborhood in price and plan. Furthermore, the value of the lots given by Murdock considered those elements that actually add value to a piece of land but which were almost nonexistent in this case, except for Route 59 and Monsey Heights Road, namely, (1) streets finished and macadamized and (2) utilities established.
The claimant’s engineer, Mr. Yuda, made his findings after the takings. He made a more favorable impression on the court. He admitted that he made no water table tests in 1952 but said he did make quite a number of borings in 1956 in various parts of the development. These tests seemed to support his own contention that an excavation below the level of -claimant’s land such as the Thruway was, tends to lower the water table in the adjoining land. The inference I read herein is that the lots previously rejected by the State Health Department should now *128 be suitable for building operations since the original impediment for approval for building purposes seems to have been removed as a result of the Thruway excavation.
The State built an access road along the northerly side of the southern 22 acres of claimant’s property. The road continues the old Monsey Heights Road to the Route 59 bridge which bridge crosses over the Thruway. The accessory road is now known as Monsey Heights Road. This road is of the same width as the original Monsey Heights Road, was turned over to the Town of Ramaipo and accepted officially on September 10, 1956.
The access road is higher than the adjoining Besen property from close to zero at the southerly extremity to over seven feet near the Route 59 bridge. My inspection convinces me, however, that a leveling process with a bulldozer of the excess high land spots within the claimant’s property itself can in a, matter of one or two days place enough of the superfluous soil in the development along most of the southerly side of the access road (except those lots close to the bridge) so as to create for the most part a gentle and acceptable grade from the access road to the ground level of the claimant’s adjoining property. The ground contiguous to the access road is part of the State’s right of way. This portion of the right of way could be used by claimant to seed and plant and be actually used as a part of the plottage of lots adjoining the access road. There was consequential damage, however, because of this condition, for which the court will make allowance.
The spring water arising in the Walser property (which property is not owned by claimant but touches his Lots 8, 16, 15 and 9 in Block C) runs downward through Lot 15 and perhaps Lot 14, to the northerly side of the Thruway. This water was directed through a culvert under the Thruway and was continued under the access road and finally into Kenneth Street, which was the proposed main street in the claimant’s property south of the Thruway. The court condemned the manner in which the Thruway Authority directed this water under the Thruway and the access road through the culvert which ended at an open sluice at the southerly end of the access road and finally dispersed itself into Kenneth Street. I considered this indifferent engineering. The court made minute studies of these conditions which developed because of the Thruway. Because of its concern over these unnecessary irritants, the court suggested to the Thruway Authority that certain changes be made. The Authority accepted the court’s suggestion that such water from the spring be diverted on the northerly part of the Thruway *129 and carried either through a pipe or in the open drainage ditch which runs alongside the northerly side of the Thruway in a westerly direction to a large existing catch basin near the northerly pediments of the Route 59 Bridge. The Authority has already carried out this suggestion. Thus a serious continuing trespass in claimant’s property has been eliminated. At the subsequent hearing, after the court had granted a motion to reopen the trial, the Authority stated for the record that it will grant to the claimant, without charge, a permanent easement for his exclusive use of the abandoned 18-inch culvert to carry utilities under the Thruway from Route 59 on the northerly side of the property into the southerly portion of his property.
At the court’s suggestion, too, the Authority has caused the mouth of the accessory road into Route 59 to be enlarged and banked in a manner to render it safer under all weather conditions. As it was previously completed, the mouth of the accessory road Was, in my opinion, very dangerous because of its sharp, angular and narrow approach to the bridge. The Authority accepted the court’s suggestion and at considerable cost completed this work. It has enlarged the mouth of the accessory road at its junction with Route 59 so that now it resembles the opening of a funnel. The road thus becomes safer for vehicles entering and leaving it from and into Route 59. The Authority has also placed a guard rail along the southerly embankment thereof which rail runs from the junction of Route 59 easterly along the accessory road for some 100 feet. Thus the danger of a car going off the road over the steep embankment has been practically eliminated.
In the opinion of the court, the access road is an asset and not a detriment to .the 22 acres remaining of the claimant’s property south of the Thruway. It is well built and is of the same width as the old Monsey Heights Road into which it runs at the easterly extremity of claimant’s property. It is thus a thoroughfare along the bulk of claimant’s remaining property which can be used by the adjoining residents to reach Suffern or Nyack. Its location serves these people well, without inviting heavy outside traffic which uses Route 59. Thus there exists a traffic safety factor benefiting children, which is a very important consideration to purchasers in a development.
Although substitute access and improved drainage provided by the State may be considered in mitigation of damages (Robinson v. State of New York, 3 A D 2d 326; Spinner v. State of New York, 4 A D 2d 987; Gilmore v. State of New York, 208 Misc. 427), by agreement, the court will not give it further consideration than the mere recounting of the facts.
*130 To proceed with any development of the southerly portion of claimant’s remaining property, water must be tapped at the northerly area and carried across the Thruway. The State contended that the water connection between the two remaining parcels could be made at the intersection of Monsey Heights Road and Route 59, then along Route 59 to the easterly end of the bridge, and then carried under the road base of the Route 59 bridge through an existing 8-inch sleeve which is available to the claimant without charge. It would be carried across to the other side of the bridge into Besen’s property. The State asserted that a six-inch water main, properly insulated, could thus be carried under the bridge and that this would not only be sufficient for the Besen property to the south of the Thruway but could be made available to others. Mr. Yuda stated that while this system would furnish enough water it is not the best method. He recommended a loop system — that is, the water should be carried from the intersection of Monsey Heights Road and Route 59 across the remaining Monsey Heights Road, under the Thruway and across the access road into Besen’s property, connected to pipes running under the bridge as aforesaid, where a series of control valves could be installed to control the loop system he recommended. In this manner he asserted that the water supply could always be guaranteed to the southerly section of Besen’s property.
After hearing all the testimony, the court is of the opinion that the single system of pipes proposed by the State would be adequate since a six-inch pipe, properly insulated, could be fitted into the eight-inch sleeve. However, as already stated, there now will be available to the claimant the 18-inch culvert under the Thruway which he could use alone or in conjunction with the 8-inch sleeve under the surface of the bridge, both of which will be available without charge. Thus, the claimant would be at liberty to build the so-called loop system, if he so desires.
Upon the trial, the attorney for the claimant attempted to have his client, Mr. Besen, testify as an expert as to the valuation of his lots, upon the ground that an owner generally may testify as to the value of his property. Although the court might have allowed the introduction of this testimony and then accorded it no weight, it could not, in good conscience, allow it under the circumstances which existed. Much has been made of this point by the attorney for the claimant. For that reason it is taken up in this decision. It is generally true that an owner may be permitted to testify as to the value of his property. The courts *131 have held that the property owner’s ownership, regardless of his knowledge, qualifies him to testify. The weight of his testimony may be very little, but he may testify to his estimate of the value of his own property. (Jahr, Eminent Domain, § 133, p. 205, citing Kinter v. United States, 156 F. 2d 5; Salt Lake & Utah R. R. Co. v. Schramm, 56 Utah 53.) It is for the trial court to determine, however, if the witness is sufficiently familiar with the property to be entitled to express an opinion. (Jahr, supra.) It is generally understood that the opinion of the owner is so far affected by bias that it amounts to little more than a definite statement of the maximum figure of his contention. It has been held that mere ownership does not render a person competent to render an opinion as to value unless he is in fact familiar with facts which give the property value. (5 Nichols, Eminent Domain [3d ed.], § 18.4, subd. [2], pp. 139, 140, citing, in n. 39; Lapwai v. Alligier, 69 Idaho 397; Chicago, Bock Is. & Gulf Ry. Co. v. Martin, 37 S. W. 2d 207 [Texas]; Rotge v. Murphy, 198 S. W. 2d 932 [Texas].) Ownership alone does not qualify one who has no knowledge of value or who is not familiar with the location, quality or value of his real estate. (32 C. J. S., Evidence, § 545, p. 306, citing Chicago, Rock Is. & Gulf Ry. Co. v. Martin, 37 S. W. 2d 207 [Texas].)
In a case where the owner of a dwelling or farm property is familiar with all of the incidents of the property which tend to affect its value, and is necessarily cognizant of all matters pertaining to the location, quality and value of bis real estate, he may properly testify as to valuation irrespective of the weight of such testimony. Here, however, Mr. Besen was merely the owner of a proposed development recently cut out from raw acreage. He had never done business before in Rockland County. He had just changed the acreage to lots. He was a speculative owner, not acquainted with the true values of each lot except as he arbitrarily set such values. He was not familiar with the values of lots thereabout.
The marking by the court of the findings of fact and conclusions of law submitted by both sides added to its own conclusions herein from the basis for the damages and valuations set herein.
The court finds that certain of the lots are to be valued as residential lots while certain others of the lots are to be considered on the basis of commercial store purposes. The court has further subdivided the residential lots as those lots found as approved by the State Department of Health and those found as unapprovéd by the State Department of Health.
*132 The court makes the following findings as to values:
The court values the residential lots approved by the State Department of Health (which numbered 47 at $1,500 each) at............................. $70,500
The court values the remaining residential lots unapproved by the State Department of Health (which numbered 31 at $1,000 each) at............. $31,000
The court adds to the basic value of the eight residential lots facing on Monsey Heights Road the sum of $750 each for the reason that these lots enjoyed all utility services plus a paved street, or a total of.. $6,000
For the three foundations erected in Section B, Lots 5 and 6, and Section O, Lot 1, the court adds $550 for each foundation additional to the basic value of the lots (the price submitted by the claimant).... $1,650
(The Markey and Hart houses — model homes — are not considered since they are not claimed for the reasons hereinbefore stated.)
For the three and one-half acres reserved for the park and drainage pond, the court finds a value of.. $5,000
For the following lots which front on Route 59 and whose highest and most suitable use the court finds was for commercial store purposes, the court finds the following values :
Section C: Lots 4 and 5 together................ $13,000
Lot 6............:................. 5,500
Lot 7.............................. 5,500
Lot 8.............................. 5,500
Lot 9.............................. 5,000
Lot 10............................. 5,000
Lot 11............................. 5,000
Section E: Lot 1.............................. 5,000
Lot 2.............................. 5,000
Lot 3 .............................. 5,000
Total................. $59,500
The total value of the entire subdivision before the taking was................................... $173,650.
The road pattern is included in the evaluation of the lots.
In arriving at the above-stated value of the subdivision before the taking, the court has considered the market value of the lots as the end result of the original investment plus all the effort and the expenses that went into the making of the lots and the road pattern as they were on the date of taking. The court also *133 considered the rise in land values between the years 1952 and 1955 as previously indicated.
The court finds that the damages sustained due to the direct taking by the State were in the sum of $60,550 which included the taking by the State of the following lots, some of which were only partly taken or damaged:
Section A: Lot 1 $300
Section B: Lot 1 1,500
Lot 2 1,500
Lot 3 1,500
Lot 4 1,500
Lot 5 2,050 including excavation destroyed
Lot 6 100
Lot 7 1,000
Lot 8 1,500
Lot 9 1,500
Lot 10 1,000
Lot 11 1,000
Lot 12 1,000
Lot 13 1,000
Lot 14 750
Lot 22 500
Lot 23 1,500
Lot 24 1,500
Lot 25 750
Lot 27 750
Lot 28 750
Section 0: Lot 19 1,000
Lot 18 750
Lot 17 750
Lot 16 750
Lot .15 750
Lot 14 1,000
5,000) Usefulness destroyed due to Lot 9
Lot 10 5,000) embankment erected
Lot 13 1,000
Lot 12 1,000
Lots 6, 7, 8, small frontage
taken....... . 2,500
$42,450 ...................... $42,450
Section D: Lot 5 $300
Lot 6 1,000
Lot 7 300
*134 Section E: Lot 1 5,000
Lot 2 5,000
Lot 3 5,000
Lot 4 1,500
$18,100 ...................... $18,100
Total damages due to the direct appropriation of claimant’s property amount to.................... $60,550
For other direct damages sustained by claimant by virtue of the many takings for fee and easement purposes, the destruction of road pattern, drainage pipes, etc., not computable, the court allows.............. $12,000
The court finds that the claimant was consequentially damaged in .the sum of...................... $30,000
Total direct and consequential damages sustained by the claimant.................................. $102,550.
The court makes no allowance for loss of profits on the alleged .shopping center. It never existed and no plans were ever filed for one. No leases or other commitments were entered into. It was a hope, not a fact. The zoning was and is residential, and even if changed to commercial the court holds that it was not economically feasible at that location by reason of the sparsity of the population and the existence of other shopping centers for a number of years within a short distance from claimant’s development. There are already existing stores nearby which cater to the every-day necessities of a family. At the best the claimant might have added a few more stores.
To summarize, the court finds that the value of claimant’s property before the appropriation was.. $173,650
The court finds that the value of the remaining
land of claimant is.............................. 71,100
The court finds that the damages sustained by the claimant, both direct and consequential, are........ $102,550.
Let judgment be entered herein for the sum of $102,550 with interest thereon from September 2,1954.