Clare J. Hoyt, J.
The County of Westchester, hereinafter called the County, acquired by condemnation title to a tract of land situate in the City of Yonkers and Town of G-reenburgh, Westchester County. The court, pursuant to the provisions of the Westchester County Administrative Code (art. 8, tit. B, §§ 101-124; L. 1948, ch. 852), is called upon to “ determine the *735 just compensation to be made to the owner or owners of and the persons interested in such property ’ ’. (Westchester County Administrative Code, § 110.)
The proceeding was commenced by the filing of a petition on July 19,1961 and on August 2,1961 a judgment of condemnation was entered. The defendants named in the petition were P. & M. Materials Corporation, the record owner (herein referred to as P. & M.), and the Boyce Thompson Institute for Plant Research, Inc., a former owner and presently the holder of a purchase-money mortgage on the condemned parcel (herein referred to as the mortgagee). Melsac Corporation (herein referred to as Melsac), a purchaser under contract at the time of the petition and judgment of condemnation and not originally a party to the action, was granted leave to intervene.
The condemned parcel contains 213.16 acres of which 166.08 acres are in the City of Yonkers and 47.08 acres in the Town of Greenburgh. The parcel is set forth as Schedule A on a map annexed to the petition herein and is described in paragraph “ 10 ” of the petition.
The parcel, unimproved except for an abandoned house and small barn to which the court attaches no value, is approximately 7,400 feet long and 1,200 feet wide. A high ridge traverses the long axis of the property in a generally north and south direction. To the west of the ridge the property slopes down to and is bounded by the New York State Thruway. To the east the property slopes down to and is bounded by Grassy Sprain Reservoir and lands of a utility company. The property is heavily wooded except for a small cleared portion adjacent to the Thruway and other minor portions on the easterly side which have precipitous slopes and outcroppings of rock. The property has two means of access: on the north, Jackson Avenue, a highway in the Town of Greenburgh, abuts the property for approximately 200 feet; and on the southwesterly corner of the property access is had to Sprain Road by means of a bridge over the Thruway. There is no access to the Thruway. A dirt road running through the property connects these public roads.
At the time of condemnation that portion of the property located in the City of Yonkers was zoned for single-family residences with a minimum plot of 10,000 square feet and that portion of the property located in the Town of Greenburgh was zoned for single-family residences with a minimum plot of 20,000 square feet.
The premises, once an arboretum, had lain idle from 1954 until their sale in 1959 by the mortgagee to P. & M. The mortgagee took back a purchase-money mortgage in the amount of *736 $650,000 and the amount due on the mortgage on the date title vested in the County was $503,750, with interest at 5% accrued from May 2, 1959. P. So M. excavated some earth from the premises and then in July of 1960 contracted to sell the premises to Melsac on the condition that Melsac procure tax abatement and a zoning change by April of 1961. Although the tax abatement and zoning change were not procured by Melsac by the specified date, the contract between P. & M. and Melsac was modified on April 19,1961 to make it absolute. Additional cash was paid thereon and the closing was scheduled for August 2, 1961, the day the County acquired title by condemnation.
The court has viewed the premises and has been furnished with three allegedly expert valuations of the property :
The parties not only differed markedly in their valuation of the premises; they also differed greatly in the basis of their valuation.
In order to determine the award here payable the court must find the actual loss sustained by the owner by virtue of the taking (Westchester County Administrative Code, § 101, subds. 6, 9; Matter of County of Westchester [Brontown Realty Corp.], 204 Misc. 1031, affd. 285 App. Div. 1169).
As was held in St. Agnes Cemetery v. State of New York (3 N Y 2d 37, 41): “It is axiomatic that in appraising land the fundamental question to be answered is ‘ what has the owner lost, not what has the taker gained ’ (Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195 [1910]), and that an owner whose property is acquired by condemnation is not limited in compensation to the use which he made of his property but is entitled to receive its market value ‘ based on the most advantageous use ’ (United States v. Miller, 317 U. S. 369, 375; Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, 82, affd. 279 N. Y. 656; Olson v. United States, 292 U. S. 246). ”
In arriving at this loss by virtue of taking or the market value, the court must consider the methods of appraisal or theories of valuation used by these experts and determine which methods and theories, if any, are sound and acceptable.
As was observed in Matter of Mountain Lakes in Westchester (219 N. Y. S. 2d 140,144), quoting from Hazard Lewis Farms v. State of New York (1 AD 2d 923, 924.): “ It is a rare condemnation proceeding indeed where the experts are not widely apart
The County’s expert $1,200,000
P. So M.’s expert 2,300,000
Melsac’s expert 4,000,000

Party

Valuation *737 in their testimony as to value and the trier of the facts is usually compelled to adopt a figure of his own based upon a reasonable analysis of the problem presented. ’ ’
The County’s expert based his appraisal on comparable sales and claimed that the best use of the premises was for a single-residence development with large plots. P. & M. ’s expert based his value on comparable sales and said that the best use of the premises was for commercial purposes and high-rise apartments. The expert for Melsac rejected both these methods, claiming that the property was too unique to permit any other sales being-considered comparable, and said that the only sound basis upon which to value would be the land residual method based upon a capitalization of earnings.
The County maintains that Melsac, a purchaser under contract, has no interest in the award other than a return of the moneys paid by it under the contract and in accordance therewith the County objected to any proof by Melsac as to the value of the premises on the taking date. The court reserved decision and permitted Melsac to offer its proof.
In a condemnation proceeding the rights of a purchaser under contract who has neither possession nor title (Melsac’s situation here) at the time title vests in the condemnor are not well defined by the New York courts.
Prior to the enactment of section 240-a of the Beal Property Law (L. 1936, ch 731, eff. May 26, 1936), a purchaser under contract, as the equitable owner of the property condemned, became entitled to the award subject to the payment of any balance due under the contract to the vendor (Clarke v. Long Is. Realty Co., 126 App. Div. 282 [1908]; Reife v. Osmers, 252 N. Y. 320 [1929]; Matter of Duncker, 22 N. Y. S. 2d 29 [Surrogate’s Ct., Richmond County, 1940]).
Real Property Law, section 240-a (Uniform Vendor and Purchaser Risk Act) provides in pertinent part :
‘ ‘ 1. Any contract hereinafter made for the purchase and sale or exchange of realty shall be interpreted, unless the contract expressly provides otherwise, as including an agreement that the parties shall have the following rights and duties:
“ (a) When neither the legal title nor the possession of the subject matter of the contract has been transferred to the purchaser: (1) if all or a material part thereof is * * * taken by eminent domain, the vendor cannot enforce the contract, and the purchaser is entitled to recover any portion of the price that he has paid
The taking involves all of the lands owned by P. & M. and purchased from the mortgagee except for an unimproved parcel *738 of .86 acres on the westerly side of the Thruway. No claim is made for damages to this small parcel. Where as here neither title nor possesssion has passed to Melsac, clause (1) (of § 240-a, subd. 1, par. [a]) of the Beal Property Law becomes applicable.
The question squarely presented is whether by virtue of this statute the purchaser under contract with neither title nor possession is relegated to the return of its down payment on the purchase price as its sole recovery.
It must first be determined whether these provisions of the statute are integrated in the contract between Melsac and P. & M. and this depends upon whether their contract made provision for their respective “ rights and duties ” in the event of condemnation.
The court in World Exhibit Corp. v. City Bank Farmers Trust Co. (270 App. Div. 654, 659, affd. 296 N. Y. 586), held that if the contract was silent “ [tjhis interpretive directive integrates these provisions into the contract ’ ’.
The only provision in the contract between Melsac and P. & M. bearing, if at all, on this question is as follows :
‘ ‘ In the' event that the seller is unable to convey title in accordance with the terms of this contract, the sole liability of the seller will be to refund to the purchaser the amount paid on account of the purchase price and to pay the net cost of examining the title, which cost is not to exceed the charges fixed by the New York Board of Title Underwriters, and the net cost of any survey made in connection therewith incurred by the purchaser, and upon such refund and payment being made this contract shall be considered cancelled. ’ ’
This paragraph does not fix the rights and duties of the parties in the event of condemnation and thus the statute is applicable. : ' i .
The statute is interpreted to limit the purchaser under contract, Melsac, to the return of its down payment.
Although no direct authorities have been furnished or found on this proposition, logic and equitable considerations dictate it. Irrespective of the value fixed in condemnation, the purchaser under contract may recover his down payment. The seller may profit if the award exceeds the contract price but must bear the loss if the award is less than the contract price. Were the statute interpreted otherwise the purchaser under contract would have everything to gain and nothing to lose. He could claim the profit if the award exceeded the contract, but he could not be held responsible by the seller for the difference between the contract price and the award should the award be less.
*739 Although, as stated, no case directly in point has been found, there seems to be agreement that the common-law rule (entitling the purchaser under contract to the condemnation award) has been changed by section 240-a of the Beal Property Law.
In Geist v. State of New York (3 Misc 2d 714, 718), dictum of the court indicates that a purchaser under contract, except for the enactment of section 240-a of the Beal Property Law, would have been entitled to a condemnation award. (See, also, 19 N. Y. Jur., Eminent Domain, p. 323.)
Nichols on Eminent Domain ([3d ed.], vol. 2, § 5.21 [1]) states the general rule, in the absence of statute, that an equitable owner is entitled to the condemnation award. However, a note in the text (p. 28, note 90) points out that in New York the situation is now covered by section 240-a of the Beal Property Law.
Melsac, in addition to claiming an interest in the award beyond its down payment, claims reimbursement for expenses it entailed for site survey, preparation of layouts, engineering costs, traffic and utility surveys, zoning applications and plans and drawings. These costs were considerable, and although some are attributable to the preparation for the trial of this matter, recovery can be had for none. Melsac can only recover its down payment.
The determination that Melsac may have the return of its down payment and nothing more or less, makes it unnecessary to consider Melsae’s voluminous evidence on valuation, except insofar as it may be an aid to the court in arriving at a fair and proper figure. It will therefore be considered along with all the other testimony on valuation.
The experts for the County and for P. & M. each referred to comparable sales which they considered in arriving at their respective valuations. The County’s expert determined the highest and best use of the property was for its development in park-like surroundings for high priced homes, two to three hundred in number, on parcels of from one quarter of an acre to one or more acres each. With this use, rezoning and access to the Thruway would be unnecessary and the County’s expert testified that should both or either be effected it would not change his opinions as to the value or best use of the property.
The expert for P. & M. said that the best uses of the property were for a research laboratory and general office site or distribution center or for a large apartment house project with commercial sites and a shopping center to serve the families on the property so that it would become a self-contained unit.
*740 Bezoning of the property would of course be necessary to permit the uses recommended by P. & M.’s expert as the highest or best uses of the property. Although there was no evidence to show any prospect for such a change in the Town of Greeniburgh, the Planning Board of the City of Yonkers, prior to the actual condemnation but after it was known condemnation was contemplated, informally approved Melsac’s plan for the commercial and large-apartment development of the property. There was, thus, some indication of a possible zoning change in Yonkers, enough for P. & M.’s expert to consider the possibility as a factor in arriving at bis valuation.
“ [WJhere the likelihood of the future exercise of [the police] power [zoning change] is so great as to have an observable effect upon present market value it may be considered in determining the compensation to be paid for such property when it is taken by eminent domain.” (4 Nichols, Eminent Domain [3d ed.], § 12.322, p. 236.)
Where “ there is a possibility or probability that the zoning restriction may in the near future be repealed or amended so as to permit the use in question, such likelihood may be considered if the prospect of such repeal or amendment is sufficiently likely as to have an appreciable influence upon present market value ”. (Nichols, Eminent Domain, supra, p. 238.) Where “the proof established ‘ the reasonable probability that the zoning might be changed ’ to permit the use of claimants’ highway frontage (then restricted to residential use) for commercial purposes * * * such probability thereupon became a factor in the determination of value. (Matter of Incorporated Vil. of Garden City, 9 Misc 2d 693, 698, affd. 4 A D 2d 783, motion for leave to appeal denied 3 N Y 2d 708; Valley Stream Lawns v. State of New York, 9 A D 2d 149.) ’’ (Masten v. State of New York, 11 A D 2d 370, 371, affd. 9 N Y 2d 796.)
P. & M. ’s expert, in addition to considering possible rezoning, also considered possible Thruway access. Based upon the efforts of Melsac, who engaged traffic consultants and conferred with the Thruway authorities, he appraised the property with the possibility of a Thruway interchange to serve the property. The topography of the property, its very limited access at the time of condemnation, and this suggested highest or best use (predicated upon a commercial and high-rise apartment use of the property requiring easy and unlimited access) make a Thruway interchange nearly as essential as a zoning change. The evidence failed to indicate the probability that a Thruway interchange would be constructed. The evidence showed that if constructed its location would not be such as to permit its free use *741 by travelers on. the Thruway and users of the premises. In addition, it appeared that $575,000 was the estimated cost of the interchange which would have to be borne by the property owner.
The comparable sales offered by P. & M. were originally 44 in number. Thirty-one were rejected as being not comparable either in point of time or by reason of the small size of the parcels considered. Of the 13 comparable sales, about which P. & M. ’s expert testified, only one, the House of Rest premises, containing 84.6 acres and adjacent to the subject property, is considered helpful in arriving at the value of the subject premises.
The County’s expert submitted as comparable sales 12 parcels having 20 or more acres. He included in his consideration the first sale of the subject premises, the one by the mortgagee to P. & M. in 1959.
The County and P. & M., although disagreeing as to value and the highest and best use of the premises, agreed on comparable sales as the method to fix value. Melsac’s expert thought the property too unique for this method and resorted to a capitalization of earnings to determine the land value. Although there may be circumstances when this method is proper, it may not be used on the subject property where there have been no improvements made and where proposed development is dependent upon zoning changes and a Thruway interchange. Melsac, with great earnestness, urged the court to calculate the fair value of the premises as follows: assume the erection of vast improvements upon this vacant land, estimate their cost, speculate on the income to be derived from the improvements, assume such income to be a certain percentage of the value of the property, and thus arrive at a valuation figure. Melsac’s experts estimated costs of construction and carrying charges of $51,370,365 exclusive of land cost. After figuring gross income (from hypothetical rent rolls on buildings for which only rough plans had been submitted on tentative locations within the subject parcel) and expenses and earnings thereon, Melsac’s expert arrived at a figure of $7,955,230 as the value of the land upon the completion of the project. He reduced this to $5,500,000 using his experiences and “ realizing contingencies involved ” without specifying them. He estimated it would take five years to complete the project and he then discounted this arbitrary valuation 10% per year and came up with a figure of $3,962,199 which he rounded off to $4,000,000 and which he then testified was the land value of the premises.
In Levitin v. State of New York (12 A D 2d 6) the court held this method of valuation improper where in a partial taking the *742 owner sought to show he intended to ereot motel units similar to those erected on the part retained. £ £ Such a method of valuation of vacant, unimproved land is completely unprecedented. There is no authority cited by claimants in support of it and none is to be found, for how can income be capitalized to produce a residual land value when the appropriated land is neither producing income nor equipped to produce such income? ” (Levitin v. State of New York, supra, p. 7.) See, also, Matter of City of New York (Blackwell’s Is. Bridge) (118 App. Div. 272, appeal dismissed 189 N. Y. 512) wherein the court held it error to consider the cost of erecting apartments and the rental value of such apartments in determining the value of the unimproved property as being too speculative and uncertain.
In Mattydale Shopping Center v. State of New York (303 N. Y. 974) an award based upon the capitalized earnings from an unbuilt shopping center was reinstated but, and the distinction is important, portions of the projected shopping center had already been leased.
The court must, thus, arrive at the fair market value of the premises on the date title vested in the County by considering the testimony of the experts who valued the premises on comparable sales and by considering independently those comparable sales which it believes to be determinative of the value of the parcel condemned.
The court accepts the sale of the subject premises (the sale scheduled for consummation on the day of condemnation) and the sale of the adjoining House of Best property containing 84.6 acres on June 21,1961 as bearing very heavily on the market value of the subject premises on the date of condemnation. How can the other sales involving 3, 5 or 10-acre parcels be used to appraise a parcel of 213.16 acres? How can large parcels of comparable acreage be used for valuation purposes when they are located in distant parts of the county and have so few if any factors in common? How can one, on the basis of sales of other properties, determine what should be added to or subtracted from such sales figures by reason of the possibility of a zoning change affecting the subject property and/or the installation of an interchange with the Thruway? The subject premises would have been sold on the day of the taking, had there been no condemnation, for $1,918,440. This price was arrived at by P. & M., the owner, and Melsac, the purchaser, in July of 1960 in what appears to be a well-negotiated contract between a seller not obliged to sell and a buyer not compelled to buy (see Matter of City of Rochester [Smith St. Bridge], 234 App. Div. 583, 586). This contract was conditioned on the purchaser securing a zon *743 ing change and tax abatement by a specified date. The purchaser did not procure the tax abatement or zoning change as provided in the contract and a dispute arose between the parties as to their respective rights under the contract. On April 19, 1961 this dispute was resolved by a modification agreement providing for an additional cash payment, the removal of the condition of zoning change and tax abatement and providing for a closing on August 2,1961 which, as it developed, was the day the County acquired title by virtue of condemnation.
The contract as modified provided that the price of $1,918,440 was to be paid as follows: $50,000 was to be paid on the execution of the original contract and modification; title was to be taken subject to the existing Boyce Thompson mortgage of $568,750; a second purchase-money mortgage of $1,108,377.50 was to be delivered; and cash of $191,312.50 was to be paid on closing.
P. & M. argues that real estate values increased from July of 1960 to August of 1961 and that by the latter date the rezoning of the premises had become more probable. The County argues there has been no appreciation in land value of the subject parcel within the year and that the rezoning or Thruway interchange possibilities has not changed. The County further asserts that the contract called for the purchaser to invest only a total of $241,312.50 in cash on a $1,918,440 purchase with a part of the balance covered by taking title subject to an existing mortgage and the remainder covered by a second purchase-money mortgage securing a bond executed by a corporation having practically no assets. Since this award is payable in cash' the County asserts that these mortgages should be discounted since their face amounts exceed their cash value (Riley v. District of Columbia Redevelop. Land Agency, 246 F. 2d 641).
There is no evidence of any substantial appreciation in the value of this property from July, 1960 to August, 1961. Furthermore, the parties actually affirmed this agreed price as late as April, 1961. Although some progress was made on the application for rezoning it does not appear that Melsac received any more consideration than would have been given any other prospective purchaser. The premises would have been sold subject to the existing mortgage of $568,750 and a second mortgage of $1,108,377.50 would have been delivered. This second mortgage cannot be considered as having a cash value in this amount. It is not readily negotiable and could only be sold at a discount. Its value depends on the value of the real property it encumbers since the bond it secures was not executed by an entity which assures its payment. The court cannot use the size of the pro *744 posed mortgage to inflate the value of the land to, in turn, establish the value of the mortgage at its face amount. There must be some reduction in its amount and a 10% reduction is deemed proper. One of P. & M.’s witnesses, experienced in mortgage financing, indicated 10% to be the discount experience in purchasing second mortgages for cash. There should be no discount of the first mortgage which was to remain on the premises since its amount is far less than the value of the premises conceded by all parties. The sale price of the premises from P. & M. to Melsac is, thus, adjusted to $1,807,602.25 which results from a reduction of the second mortgage from its face amount of $1,108,377.50 to $997,539.75, which latter figure is considered to be the market value of the second mortgage.
The House of Best premises of 84.6 acres adjoining the premises herein condemned were sold in June of 1961 for $950,000. The topography of both premises is much the same and access is by the same bridge over the New York State Thruway. Substantial improvements exist on the House of Best premises consisting of residences and hospital buildings. P. & M. sought to show these improvements to be valueless in an effort to ascribe the full sale price to the land. The County’s proof showed the buildings to have a very considerable value. Thus, the value of the land per acre is found to be comparable to the land value per acre for the subject premises.
The prior sale of the subject premises for $865,000 in 1959 does not establish the fair market value on the date of condemnation. The seller in 1959 did not offer to sell the premises to the general public and the price obtained did not, in the court’s opinion, represent the value of the premises.
The County objected to the court’s consideration of sales of other properties or sales of the subject premises that were not consummated by the passage of title prior to the date of condemnation. The Westchester County Administrative Code (§ 109, subd. [a]) specifically provides that sales of the property taken may be considered. Subsequent sales may be considered if not too remote (Pauly v. State of New York, 14 Misc 2d 314; Dormann v. State of New York, 4 AD 2d 979, motion for leave to appeal denied 4 N Y 2d 676). The sale from P. & M. to Melsac was, of course, never consummated but, as previously pointed out, the evidence indicates that the sale was scheduled to be consummated on the date of condemnation had it not been for the condemnation.
The mortgagee seeks to recover from P. & M. 1% interest on the principal balance of the mortgage from the date of taking to the date of final payment. The 1% is the differential between *745 the mortgage rate of interest, 5%, and the statutory rate of interest on the award, 4%, as fixed by section 3-a of the G-eneral Municipal Law. In accordance with section 108 of the Westchester County Administrative Code this claim must be resolved herein.
Since the land condemned constituted all but .86- of an acre of the lands covered by the mortgage and since the award far exceeds the mortgage indebtedness and results in the payment of the mortgage, the mortgagee was not forced to elect between pursuing his rights under the mortgage or asserting his equitable lien against the award. Thus, Fliegel v. Manhattan Sav. Bank (296 N. Y. 214) and Muldoon v. Mid-Bronx Holding Corp. (287 N. Y. 227) which held that an election to assert the equitable right in the condemnation proceeding limited the mortgagee to interest at the statutory rate and not at the mortgage rate are distinguished. However, the effect is the same. No election was here possible or required since the mortgagee had no opportunity to proceed against P. & M. on the mortgage and is receiving full principal payment from the award. The mortgagee, thus, must bear the reduction in the return on its investment where, as here, the lands condemned constitute practically all of the mortgage security so as to preclude an action against the mortgagor. The parties herein were previously before this court wherein the mortgagee sought the payment of its mortgage by the County prior to the award. In denying the application the court recognized the incidents that befall a mortgagee who takes as security lands that are condemned (35 Misc 2d 197, affd. 17 A D 2d 822). Since the mortgagee is receiving all of the principal and interest to which it is entitled on the mortgage, the lien thereof presently existing on the .86-acre parcel must be discharged.
There thus remains the valuation of the subject premises. Upon the adjustment of the sale price from P. & M. to Melsac resulting from the reduction in the value of the second mortgage, the court finds the subject premises to have a value of $1,807,602.25 on the date of condemnation.
On the date of taking the principal sum due on the mortgage held by Boyce Thompson Institute for Plant Research, Inc. was $503,750, with interest at 5% from May 24, 1961 to August 2, 1961 amounting to $4,757.64. Damages are awarded to Boyce Thompson Institute for Plant Research, Inc. in the amount of $508,507.64, with interest at 4% per annum from August 2, 1962. Melsac Corporation, the purchaser under contract, is limited in its recovery to $50,000 paid by it on account of the contract and it is thus awarded the sum of $50,000, with interest at 4% per *746 a.nrmm from August 2, 1961. The balance of the award of $1,249,094.61, with interest thereon at the rate of 4% per annum from August 2, 1961 is awarded to P. & M. Materials Corporation. The defendant P. & M. Materials Corporation is further allowed costs and a special allowance of $2,000 pursuant to section 113 of the Westchester County Administrative Code.